**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHARLES BROWN; JOSEPH B.
JENKINS, III; BRIAN CHISHOLM; GAIL
MANUEL,

        *Plaintiffs-Appellants,*

v.

DAVID HOVATTER; FAYE PETERSON;
MICHAEL RUCK, SR.; GLADYS
SEWELL; DONALD V. BORGWARDT;
MARSHALL JONES, JR.; MICHAEL
KRUGER; BRIAN HAIGHT; ROBERT
BRADSHAW; JEFFREY POPE; VERNON
STRAYHORN, SR., in their official
capacities as members of the
Maryland State Board of
Morticians,

        *Defendants-Appellees.*

No. 08-1121

CHARLES BROWN; JOSEPH B.
JENKINS, III; BRIAN CHISHOLM; GAIL
MANUEL,

*Plaintiffs-Appellees,*

v.

DAVID HOVATTER; FAYE PETERSON;
MICHAEL RUCK, SR .; GLADYS
SEWELL; MARSHALL JONES, JR.;
MICHAEL KRUGER; DONALD V.
BORGWARDT; ROBERT BRADSHAW;
JEFFREY POPE; BRIAN HAIGHT;
VERNON STRAYHORN, SR., in their
official capacities as members of
the Maryland State Board of
Morticians,

*Defendants-Appellants.*

No. 08-1125

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:06-cv-00524-RDB)

Argued: January 27, 2009

Decided: March 27, 2009

Before NIEMEYER, TRAXLER, and SHEDD,
Circuit Judges.

Affirmed in part and reversed in part by published opinion.
Judge Niemeyer wrote the opinion, in which Judge Traxler
joined. Judge Shedd wrote a separate concurring opinion.

**COUNSEL**

**ARGUED:** Clark Neily, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellants/Cross-Appellees. Steven Marshall Sullivan, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees/Cross-Appellants. **ON BRIEF:** William H. Mellor, Jeffrey T. Rowes, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellants/Cross-Appellees. Douglas F. Gansler, Attorney General of Maryland, Kathleen A. Ellis, Assistant Attorney General, Grant D. Gerber, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees/Cross-Appellants.

---

**OPINION**

NIEMEYER, Circuit Judge:

Charles Brown, Joseph Jenkins, Brian Chisholm, and Gail Manuel, who refer to themselves as "funeral and cemetery entrepreneurs," commenced this action to strike down as unconstitutional the Maryland Morticians and Funeral Directors Act (the "Morticians Act"), Md. Health Occ. Code § 7-101 *et seq*. They contend that the Act, insofar as it prohibits *corporate* ownership of mortician's licenses and funeral establishments (except for 58 corporations grandfathered into the Act in 1945) and *unlicensed individual* ownership of funeral establishments (except for surviving spouses and executors of licensed morticians), violates the Equal Protection Clause, the Due Process Clause, and the dormant Commerce Clause of the U.S. Constitution. They argue: "Effectively shielded from most out-of-state competition, Maryland funeral industry members profit handsomely from the most blatantly anti-competitive funeral regulation in the nation, [effectively] add[ing] nearly $800 to the cost of a

funeral in Maryland." (Internal quotation marks and record references omitted). They claim that they are unable to participate equitably in Maryland's funeral industry because of Maryland's anticompetitive restrictions on funeral establishment ownership.

The district court, ruling on motions for summary judgment, concluded that the Morticians Act did not violate either the Equal Protection Clause or the Due Process Clause, but that it did violate the dormant Commerce Clause. In support of its dormant Commerce Clause ruling, the court said that the Act's "corporate [ownership] prohibition severely limits the ability of out-of-state businesses from opening a funeral home in Maryland." The parties filed cross-appeals.

For the reasons that follow, we affirm the district court's conclusions with respect to the Equal Protection Clause and the Due Process Clause for substantially the same reasons given by the district court. And because Maryland's licensing requirements do not unjustifiably burden interstate commerce, we reverse the district court's dormant Commerce Clause ruling. At bottom, we conclude that the Morticians Act is constitutional as to each of the plaintiffs' challenges.

I

The Morticians Act requires individuals who wish to "practice mortuary science in [Maryland]," to be licensed by the Maryland State Board of Morticians. Md. Health Occ. Code § 7-301(a). To qualify for a license, an individual must be of good moral character; must have completed an apprenticeship; must have a specified educational background; and must have passed national and Maryland examinations. *Id.* § 7-303(b).

The Act also requires any individual who owns a "funeral establishment" to license the establishment, *i.e.*, "building, structure, or premises from which the business of practicing

mortuary science is conducted." *Id.* §§ 7-310, 7-101(h). Unlicensed individuals may not own a funeral establishment, except for spouses and executors of deceased licensed individuals. *Id.* §§ 7-310(c)(2), 7-308, 7-308.1.

Corporations, except those grandfathered in as of 1945, may not be licensed as morticians or funeral directors, *id.* § 7-309, and may not own a funeral establishment, *see id.* § 7-310. Under the grandfather clause, enacted in 1945, a corporation, that held a license on June 1, 1945, that has been continually renewed, may own and operate a funeral establishment and continue to do so as long as the corporation exists, provided that "any practice of mortuary science that is conducted for the corporation is practiced by a licensed individual." *Id.* § 7-309(b), (d). The parties agree that there are 58 corporations grandfathered under § 7-309(b), that are licensed to engage in the business or profession of "funeral directing or embalming," allowing them to own and operate funeral establishments, and the stock of these corporations is freely transferable by its owners. Currently, the stock of 3 of the 58 corporations remains in the hands of the original owners, and the stock of 30 of those corporations is held by out-of-state public corporations and national chains. The plaintiffs claim that it can cost up to $250,000 to purchase the stock of a corporation grandfathered to hold a license.

The four plaintiffs wish to own and operate funeral establishments through the corporate form without being individually licensed. Brown is a Maryland resident who owns a cemetery in Hagerstown, Maryland, and who built a funeral home that is now operated by his son. Because Brown is not licensed under the Morticians Act, he cannot own the funeral home he built, but he would like to do so through a corporation.

Jenkins is a Maryland resident who is licensed as a mortician. He is the supervising mortician of a funeral establishment in Prince George's County, Maryland, which was built

by his family. He indicates that he would like to own his own funeral establishment through a corporation. He asserts that he cannot afford to buy the stock of a grandfathered corporation that owns a license because the going rate is "up to $250,000."

Chisholm is a former Maryland resident who now resides in Florida. He is licensed by Maryland as a mortician and owns a licensed funeral establishment in Timonium, Maryland. Since relocating to Florida in 2005, he states that his business has been operated by a "subcontractor . . . as the supervising mortician." He would like to expand his funeral business in Maryland as an "ordinary business corporation."

Manuel is a Maryland resident who, through a corporation, owns a cemetery in Waldorf, Maryland. Although she is not a licensed mortician, Manuel would like to own and operate, through a corporation, a funeral establishment on the grounds of her cemetery because "owning a business through a corporation is the best way to operate." She states, however, that her plans cannot include paying the "exorbitant price, as much as $250,000," for the stock of a grandfathered corporation.

In short, each of the plaintiffs wants to engage in the practice of mortuary science through a corporation, and two wish to do so without becoming individually licensed. Therefore each is challenging Maryland's right to bar corporations from being licensed as morticians and owning licensed funeral establishments and to require the owner of a funeral establishment to be a "licensed individual."

The plaintiffs commenced this action against the Maryland State Board of Morticians and Funeral Directors ("Maryland") to declare the restrictions unconstitutional and to enjoin their enforcement. In their complaint, the plaintiffs allege that they have been denied equal protection of the law, in violation of the Equal Protection Clause of the Fourteenth Amendment, because there is no rational reason why they are not permitted

to own funeral homes either through a corporate form when grandfathered corporations can do so or as unlicensed individuals when surviving spouses and executors can do so. They also contend that the Morticians Act denies them the right "to earn an honest living in the occupation of their choice by imposing restrictions on the ownership of funeral homes that are not rationally related to any legitimate public purpose," in violation of the Due Process Clause of the Fourteenth Amendment. Finally, they allege that but for Maryland's restrictions on corporate and unlicensed individual ownership of funeral homes, persons and companies outside of the State "would pursue funeral home business opportunities in Maryland that they are not currently pursuing because of the restriction[s]. This substantial barrier to entry into the Maryland funeral home industry imposes an undue burden on interstate commerce in comparison with the legitimate local interests protected by the law, which in fact are none" and that therefore the restrictions on corporate and unlicensed individual ownership violate the dormant Commerce Clause.

On cross-motions for summary judgment, the district court rejected the plaintiffs' challenges to the Morticians Act under the Equal Protection and Due Process Clauses, concluding that "the Maryland General Assembly could have rationally determined that the public's health, safety and welfare are furthered by requiring that a licensed mortician own the funeral home where mortuary science is practiced." The court, however, sustained the plaintiffs' challenge to the Act's corporate ownership prohibition under the dormant Commerce Clause, concluding that it is "a protectionist piece of legislation" that is "clearly anti-competitive." The court reasoned:

> The corporate prohibition severely limits the ability of out-of-state businesses from opening a funeral home in Maryland. Even if one of the fifty-eight licenses does become available, a prospective out-of-state purchaser must pay an inflated price for the license. The undisputed record in this case indicates

that these burdens are intolerable and clearly exces-
sive in relation to any benefits proffered by [Mary-
land].

The district court also held that the Morticians Act's require-
ment that funeral establishments be owned by licensed indi-
viduals was not properly challenged under the dormant
Commerce Clause and that Maryland could require corpora-
tions wishing to own funeral establishments to be themselves
owned by licensed funeral directors or morticians.

The plaintiffs appeal from the portion of the district court's
judgment upholding the Maryland Morticians Act against
equal protection and due process challenges, as well as the
court's refusal to consider the licensed individual ownership
requirement under the dormant Commerce Clause. And Mary-
land appeals from the portion of the judgment ruling that the
corporate ownership restriction of the Morticians Act violates
the dormant Commerce Clause. Because the district court
struck down the Morticians Act under the dormant Commerce
Clause, we begin our analysis by addressing that issue.

II

The plaintiffs claim the following to support their argument
that the Morticians Act's restrictions on corporate and unli-
censed individual ownership of funeral establishments violate
the dormant Commerce Clause: (1) that as a result of the
restrictions, "the rate of out-of-state investment in the Mary-
land funeral industry is significantly lower than it would be
absent the challenged restrictions"; (2) that the restrictions
effectively exclude out-of-state funeral industry entrepreneurs
"from the Maryland funeral market, despite their strong desire
to enter it," because "the only practical way for out-of-state
investors to own funeral homes in Maryland is through corpo-
rate ownership"; and (3) that "Maryland funeral industry
insiders fought indefatigably for over a decade to prevent the
General Assembly from eliminating these restrictions that

suppress competition and supply the industry [in Maryland] with windfall profits." They conclude that in these ways the restrictions "impose significant burdens on interstate commerce without any countervailing public benefits," in violation of the dormant Commerce Clause.

Maryland responds that the restrictions on corporate and unlicensed individual ownership do not burden interstate commerce, "even if [they] result[ ] in greater costs or inefficiencies for certain companies." It notes that "differences between Maryland's concededly 'even handed' and nondiscriminatory corporate licensure statute and the laws of other states are to be expected, and should not be mistaken for a 'burden' on interstate commerce." Maryland argues that the restrictions on funeral establishment ownership are rationally justified because the use of corporations "causes such business to be owned by people who do not know anything about" the business and because the restrictions foster a greater degree of accountability to regulators. It claims that the Maryland General Assembly had a rational basis for believing that "limiting funeral home licenses to *licensed individuals* would foster a greater degree of accountability to regulators than would the continued licensing of corporations, which are inherently designed to limit the personal responsibility of owners. That rational legislative judgment could reasonably be expected to yield putative benefits by allowing the [Morticians'] Board to better 'protect the health and welfare of the public.'" (Quoting Md. Health Occ. Code § 7-103).

The Commerce Clause states, "The Congress shall have Power . . . To regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, and it is well-established that this affirmative grant of authority implies a "negative" or "dormant" constraint on the power of the States to enact legislation that interferes with or burdens interstate commerce. *See Dennis v. Higgins*, 498 U.S. 439, 447 (1991) ("It is also clear, however, that the Commerce Clause does more than confer power on the Federal Government; it is also a substantive

restriction on permissible state regulation of interstate commerce" (internal quotation marks and citation omitted)); *Healy v. Beer Inst.*, 491 U.S. 324, 326 n.1 (1989) ("This Court long has recognized that this affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce"). As the Supreme Court recently observed, "The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue of Ky. v. Davis*, 128 S. Ct. 1801, 1808 (2008) (internal quotation marks and citation omitted). The dormant Commerce Clause walks a narrow path leading courts to "rebuff[ ] attempts of states to advance their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state, while generally supporting their right to impose even burdensome regulations in the interest of local health and safety." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949). Thus, not all economic harms or anticompetitive choices are remedied through the application of the dormant Commerce Clause, but rather only those that *unjustifiably burden* interstate commerce.

The analysis for determining whether a state law violates the dormant Commerce Clause proceeds on two tiers. On the first tier, it inquires whether the state law *discriminates* against interstate commerce. Unless discrimination is demonstrably justified by a factor unrelated to economic protectionism, a "discriminatory law is virtually *per se* invalid." *Davis*, 128 S. Ct. at 1808 (internal quotation marks and citation omitted); *see also Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 567 (4th Cir. 2005). If there is no discrimination, a court will consider on the second tier whether the state laws "unjustifiably . . . burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Oregon*, 511 U.S. 93, 98 (1994); *see*

*also Yamaha*, 401 F.3d at 567. In addressing whether a state law unjustifiably burdens interstate commerce, the courts generally apply the so-called *Pike* test, under which the challenged law "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

In this case, no contention is made that the Morticians Act discriminates against interstate commerce, and the district court concluded that there was no evidence of any discriminatory purpose. Rather, the issue presented is whether the corporate and individual licensure restrictions in the Morticians Act burden interstate commerce, and, if so, whether the burden is "clearly excessive" and not justified by putative local benefits. We begin that inquiry by identifying the commerce implicated and how the Morticians Act purportedly burdens it.

The Morticians Act regulates the practice of mortuary science in Maryland, which includes the operation of funeral establishments, the preparation of dead bodies for disposition, and the arrangement for final disposition of dead bodies. *See* Md. Health Occ. Code §§ 7-301(a), 7-302, 7-101(p),(q). The practice of mortuary science is inherently a local profession, typically used by relatives to have the bodies of dead family members prepared for burial or other disposition and to provide a facility for visitation, mourning, and services. Indeed, other than providing out-of-state caskets, which are not in any way regulated by the Morticians Act, the service provided through the practice of mortuary science begins and ends within the State.

In licensing the profession and the establishments at which it is practiced, the Maryland Morticians Act does not purport to regulate activity outside of Maryland, and it focuses only on the services provided in Maryland at a funeral establishment in Maryland. Importantly, the regulation does not address, nor thereby affect, the flow of any goods or articles

of commerce across state lines. The regulation concerns itself only with the provision of services from a physical establishment in the State. Thus, the Morticians Act purports to regulate an industry that is inherently local, not interstate, in nature.

Moreover, the Morticians Act does not treat persons from out-of-state any differently than persons in-state. Any person —out-of-state or in-state—may obtain a license to practice mortuary science and own and operate a funeral establishment in Maryland, and there is no limit on the number of licenses that the State may issue. Likewise, with respect to the 58 grandfathered corporations owning licenses, any person or corporation, out-of-state or in-state, may own the stock. Indeed, over one-half of the grandfathered corporations are owned by publicly-held out-of-state corporations.

In sum, any individual may practice mortuary science in Maryland, own a funeral establishment in Maryland, or own the stock of a grandfathered corporation holding a Maryland license to operate a funeral establishment. The only restrictions that are imposed by the Morticians Act relate to professional education, experience, and accountability. Thus, entry into the Maryland funeral services market is limited only by the choices of the individual as to how best to allocate his or her time and resources.

The dormant Commerce Clause is implicated by burdens placed *on the flow of interstate commerce*—the flow of goods, materials, and other articles of commerce across state lines. *See Oregon Waste Sys.*, 511 U.S. at 98 (stating that the dormant Commerce Clause "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce"); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 803 (1976) (noting that it is "well established by the history of the Commerce Clause, that this Nation is a common market in which state lines cannot be made barriers to the free flow of both raw materials and finished goods in

response to the economic laws of supply and demand"). And it is a trade barrier to the free flow of goods, materials, and other articles of commerce across state lines that violates the dormant Commerce Clause. The Clause does not purport to restrict or limit intrastate commerce, nor protect the participants in intrastate or interstate markets, nor the participants' chosen way of doing business. *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978) ("We cannot . . . accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market" or "particular interstate firms").

Yet, it is precisely the particular structure or methods of operation in the Maryland retail market for funeral services about which the plaintiffs in this case complain, not about a burden on the flow of articles of commerce across state lines. Their complaints about the regulation center around either the inconveniences presented to them personally or the restrictions on how they would prefer to run their businesses when operating in Maryland.

They assert that corporate ownership of funeral establishments would facilitate financing, would protect them from personal liability, and would enable them to pass the business on to others, particularly family members. In addition, they state that operating through a corporation would simply be a preferable way of doing business. Brown states, "I want to own and operate a funeral establishment on the grounds of Rest Haven Cemetery, but I do not want to become a licensed mortician." Jenkins states, "It is no coincidence that the largest funeral establishments in Maryland . . . are set up through the 58 special corporate licenses under the 'grandfather' clause. I simply want to be able to do what the law allows those businesses and businesspeople to do." Chisholm, who is a mortician licensed in Maryland but who lives in Florida, states, "[T]he challenges of running a Maryland business from Florida, particularly with respect to financing and liability, make corporate ownership essential if I am to expand Chis-

holm Funeral Services according to my plans." And Manuel states: "Neither my husband nor I want to devote the time and money to becoming licensed funeral directors or morticians. . . . Ideally, we want to own and operate our proposed funeral home as an ordinary business corporation . . . [but] [o]ur plans do not allow us to pay the exorbitant price, as much as $250,000, that one of these 'grandfather' corporations cost."

In short, the plaintiffs are challenging the way Maryland authorizes them to do business within the State in a profession regulated by the State. Their complaints do not involve burdens placed on the interstate movement of goods, materials, or other articles of commerce, and the matters of which they complain—the manner of professional practice in Maryland— are not matters protected by the dormant Commerce Clause. As the Supreme Court stated in *Exxon*, "We cannot . . . accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market. . . . [T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon*, 437 U.S. at 127-28.

In *Exxon*, a Maryland statute provided that producers or refiners of petroleum products, such as Exxon and Shell, could not operate retail service stations within Maryland. Exxon and other petroleum producers and refiners challenged the statute on constitutional grounds, including the dormant Commerce Clause, pointing to evidence that the statute's divesture requirements would cause at least three refiners to stop selling gasoline in Maryland, depriving consumers of competition and even certain special services. The Supreme Court rejected the argument, noting that "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another," even if it will "change the market structure by weakening independent refiners." *Exxon*, 437 U.S. at 127. The Court explained:

> [T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations. It may be true that the consuming public will be injured by the loss of the high-volume, low-priced stations operated by the independent refiners, but again that argument relates to the wisdom of the statute, not to its burden on commerce.

*Id.* at 127-28.

Likewise in the case before us, the Morticians Act "does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market." *Exxon*, 437 U.S. at 126. In fact, large funeral home conglomerates have a presence in the Maryland funeral services market, albeit not as large as they would like. But the fact that the burden of this permissible state regulation falls on corporations that may have interstate operations "does not, by itself, establish a [violation of the dormant Commerce Clause]." *Id.*

Further, just like the oil companies in *Exxon*, the plaintiffs complain that the Morticians Act hurts Maryland consumers and drives up the costs of funerals. The burden of this regulation, however, falls on *Maryland consumers*, not on *interstate commerce*, and a complaint about this burden "relates to the *wisdom* of the [Maryland] statute, not to its burden on [interstate] commerce." *Exxon*, 436 U.S. at 128 (emphasis added).

The plaintiffs rely heavily on our decision in *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560 (4th Cir. 2005), to support their claim that the Morticians Act violates the dormant Commerce Clause. They assert that *Yamaha*, which struck down a Virginia statute under the dormant Commerce Clause, is "directly on-point and provided the legal basis for the district court's commerce clause ruling" in this case.

In *Yamaha*, the Virginia statute at issue provided protection to existing motorcycle dealers in Virginia against the creation of new dealerships by motorcycle manufacturers and distributors such as Yamaha and Harley-Davidson, by giving the existing dealers the right to protest the creation of a new dealership through a process that "could take years to resolve," even if the protest were "frivolous." *Yamaha*, 401 F.3d at 571 (internal quotation marks and citation omitted). Moreover, a dealer could protest the appointment of a new dealer even if the new dealership were across the State, some 500 miles away and indisputably outside of the relevant market of the protesting dealer for selling motorcycles. *Id.* Yamaha, an out-of-state manufacturer and distributor of motorcycles, challenged the statute under the dormant Commerce Clause, arguing that the Virginia statute created an unjustifiable burden on interstate commerce by burdening Yamaha's ability to distribute motorcycles in Virginia. Agreeing with Yamaha's claim, we concluded that the Virginia statute did indeed "create[ ] a significant barrier to market entry . . . because of the virtual certainty of a protest whenever a manufacturer attempts to authorize a new dealership." *Id.* (internal quotation marks and citations omitted). Because the delay in costs in the face of increasing demand in Virginia for motorcycles caused Yamaha and Harley-Davidson to forego establishing new dealers, we concluded that the Virginia statute imposed "heavy burdens predominantly on out-of-state interests" and thus "unduly burden[ed] commerce." *Id.* at 573.

Thus, *Yamaha* invalidated a statute that was aimed at the *interstate flow* of motorcycles into Virginia. Unlike in *Yamaha*, however, the Maryland Morticians Act is not aimed at any interstate flow of goods, materials, or articles of commerce. The Morticians Act is a local regulation of a localized profession where services are performed for clients entirely in Maryland. Rather than aiming at the interstate flow of commerce, the Morticians Act is aimed at making morticians and funeral directors in Maryland directly accountable to clients who come to them in Maryland to provide funeral services at

their funeral establishments in Maryland. *Yamaha* does not advance the plaintiffs' argument that the Morticians Act imposes an unjustified burden on interstate commerce.

Because the Morticians Act does not place a barrier or burden on the flow of interstate commerce, it does not violate the dormant Commerce Clause. But even if it was considered to place an incidental burden on commerce, that incidental burden would not be excessive in light of the putative benefits from the Act's regulation.

While Maryland does not have extensive records explaining the purpose of the Act, the Supreme Court has recognized that promoting familiarity between an owner and his business in a licensed and regulated industry is a legitimate local interest. *See North Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 166-67 (1973); *see also Goldfarb v. Supreme Court of Va.*, 766 F.2d 859, 862 (4th Cir. 1985) (recognizing that a state law exempting from examination lawyers licensed out of state who moved into Virginia to practice full time provides a putative local benefit because "the full-time practice requirement promotes familiarity with Virginia law among attorneys who have not passed the state bar examination"); *id.* (recognizing the "broad power [of States] to establish standards for licensing practitioners and regulating the practice of professions" (internal quotation marks and citation omitted)). More broadly, a State "has a substantial interest in preventing the corporate form from becoming a shield for unfair business dealing." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 93 (1987). The district court recognized that these very principles apply in this case to support "the notion that ownership of corporations may be limited in highly skilled occupations where licensing is required, such as mortuary science."

Maryland asserts that "limiting funeral home licenses to licensed individuals [will] foster a greater degree of accountability to regulators than would the continued licensing of

corporations, which are inherently designed to limit the personal responsibility of owners. That rational legislative judgment could reasonably be expected to yield putative benefits by allowing the [Morticians'] Board to better 'protect the health and welfare of the public.'" (Quoting Md. Health Occ. Code § 7-103). And the State's position is indeed advanced by the complaint in this case and the affidavits of the plaintiffs where they assert that they desire to use the corporate form because they "want to be insulated from personal liability for . . . negligence." This is precisely the kind of personal responsibility that the Morticians Act wishes to maintain. Indeed, the Maryland State Board of Morticians expressed this concern, claiming that unlicensed individuals and corporations would be less accountable. Thus, the Morticians Act provides individual liability and therefore more direct accountability for owners of funeral establishments while the plaintiffs desire less individual liability. This is the type of legislative decisionmaking into which courts should avoid inserting themselves. *See, e.g.*, *Powers v. Harris*, 379 F.3d 1208, 1222 (10th Cir. 2004) ("While the creation of such a libertarian paradise may be a worthy goal, Plaintiffs must turn to the . . . electorate for its institution, not us").

In short, we conclude that the Morticians Act's incidental burden on interstate commerce is not excessive and is justified by the very real benefits of protecting the public health, safety, and welfare by encouraging familiarity of the owner of a funeral business with the day-to-day workings of that business and creating accountability to regulators and to clients. Accordingly, we reverse the district court's conclusion that the Act violates the dormant Commerce Clause.

### III

In addressing plaintiffs' Due Process and Equal Protection Clause arguments, we agree with the district court's reasoning rejecting these arguments. Because the Morticians Act is an economic regulation, we may not strike it down unless it is

"wholly arbitrary, without any basis in reason." *Guardian Plans Inc. v. Teague*, 870 F.2d 123, 126 (4th Cir. 1989) (internal quotation marks and citation omitted). In other words, to survive such challenges, the Act need only be "rationally related to a legitimate state interest." *Id.*

Our court has already recognized that a State has a "legitimate interest in protecting the health, safety and welfare of its citizens through regulation of the funeral profession." *Guardian Plans*, 870 F.2d at 126. A State's legislature may "rationally determine[ ] that keeping the arrangement of funerals in the hands of licensed funeral professionals would benefit the public by ensuring competence in funeral arrangement. Our inquiry [under the Equal Protection and Due Process Clauses] ends here." *Id.*

Moreover, there is a rational basis to restrict corporate and unlicensed individual ownership of professional businesses. *See North Dakota Pharmacy Bd.*, 414 U.S. at 166-67. In *North Dakota Pharmacy Board*, the North Dakota legislature required that in order to obtain a permit to operate a pharmacy, the applicant had to be a registered pharmacist in good standing or a corporation or association, the majority of whose stock must be owned by registered pharmacists in good standing who are active in the day-to-day affairs of the corporation or association. In upholding those restrictions on corporate ownership, the Supreme Court explained that a rational relationship exists between restricting corporate ownership and the professions, quoting with approval Justice Holmes' dissenting opinion in *Louis K. Liggett Co. v. Baldridge*, 278 U.S. 105, 114-15 (1928) (Holmes, J. dissenting):

> "A standing criticism of the use of corporations in business is that it causes such business to be owned by people who do not know anything about it. Argument has not been supposed to be necessary in order to show that the divorce between the power of control and knowledge is an evil. The selling of drugs

and poisons calls for knowledge in a high degree, and [the State] after enacting a series of other safeguards has provided that in that matter the divorce shall not be allowed. Of course, notwithstanding the requirement that in corporations hereafter formed all the stockholders shall be licensed pharmacists, it still would be possible for a stockholder to content himself with drawing dividends and to take no hand in the company's affairs. But obviously he would be more likely to observe the business with an intelligent eye than a casual investor who looked only to the standing of the stock in the market. The Constitution does not make it a condition of preventive legislation that it should work a perfect cure. It is enough if the questioned act has a manifest tendency to cure or at least to make the evil less."

*North Dakota State Bd.*, 414 U.S. at 166-67. The same rationality exists for upholding the restrictions on corporate and unlicensed individual ownership in the Morticians Act.

The rationality of restricting corporate ownership in the Morticians Act is not undermined by exemptions contained in the Act, so long as the exemptions too are rationally based. *See Goldfarb*, 766 F.2d at 862-63 (finding rational an exemption from a state bar exam for out-of-state lawyers who moved to Virginia to practice full time even though bar applicants generally must take the bar exam before being licensed).

In the Morticians Act, corporations that historically held licenses in the funeral business were allowed to continue to hold licenses because the General Assembly wanted to protect reliance interests of family members. For a similar reason, spouses of deceased licensees are exempted from being licensed to allow the spouse, who presumably was already involved in the affairs of the business, to continue the business. The Act also provides an exemption for executors of licensees, allowing the temporary operation of the funeral

establishment to wind down the affairs of the business. The fact that the General Assembly created these rational exemptions does not undermine the overall rationality of the Morticians Act based on its relationship to a legitimate government purpose. *See Goldfarb*, 766 F.2d at 862-63.

The plaintiffs' position boils down to a disagreement with the General Assembly's judgment in refusing to authorize a different structure for practicing mortuary science in Maryland. This disagreement, however, is not a basis on which to render the Morticians Act unconstitutional.

> [A] law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the . . . requirement.
>
> * * *
>
> [T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.
>
> The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. . . . For protection against abuses by legislatures the people must resort to the polls, not to the courts.

*Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487-88 (1955) (internal quotation marks and citations omitted).

## IV

We conclude that the Morticians Act does not violate the dormant Commerce Clause, and accordingly we reverse the district court's judgment in that regard. We also conclude that the Act does not violate either the Equal Protection Clause or the Due Process Clause, and accordingly we affirm the district court in that regard.

The judgment of the district court is therefore

*AFFIRMED IN PART AND REVERSED IN PART*.

SHEDD, Circuit Judge, concurring:

I concur in the judgment reached by the majority. As to the dormant Commerce Clause issue, I concur to the extent that we find "that the Morticians Act's incidental burden on interstate commerce is not excessive and is justified by the very real benefits of protecting the public health, safety, and welfare by encouraging familiarity of the owner of a funeral business with the day-to-day workings of that business and creating accountability to regulators and to clients." *See Majority Op.* at 18.