**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3591
_____

ERNEST F. HEFFNER; HARRY C. NEEL; BART H.
CAVANAGH, SR.; JOHN KATORA; BRIAN LEFFLER;
REBECCA ANN WESSEL; MARK PATRICK
DOUGHERTY; CYNTHIA LEE FINNEY; NATHAN RAY;
TODD ECKERT; BEN BLASCOVICH; MATTHEW
MORRIS; WILLIAM SUCHARSKI; JOHN MCGEE;
AMBER M. SCOTT; ERIKA HAAS; NICOLAS
WACHTER; DAVID HALPATE; PATRICK CONNELL;
EUGENE CONNELL; MATTHEW CONNELL; JAMES J.
CONNELL, JR; JEFFERSON MEMORIAL PARK, INC;
JEFFERSON MEMORIAL FUNERAL HOME, INC.;
WELLMAN FUNERAL ASSOCIATES INC., doing business
as Forest Park Funeral Home; EAST HARRISBURG
CEMETERY COMPANY, doing business as East Harrisburg
Cemetery & Crematory; ROBERT LOMISON; CRAIG
SCHWALM; GREGORY J. HARVILLA; BETTY FREY


v.


DONALD J. MURPHY; JOSEPH A. FLUEHR, III;
MICHAEL J. YEOSOCK; BENNETT GOLDSTEIN;
JAMES O. PINKERTON; ANTHONY SCARANTINO;
BASIL MERENDA; MICHAEL GERDES; PETER
MARKS; C.A.L. SHIELDS,
                                        Appellants

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 4-08-cv-00990)
District Judge:  Honorable John E. Jones III
_____

Argued:  June 11, 2013

Before:  MCKEE, Chief Judge
AMBRO and GREENBERG, Circuit Judges

(Opinion filed: February 19, 2014)

James K. Kutz (argued)
Jason G. Benion
Post & Schell, P.C.
17 North Second Street, 12th Floor
Harrisburg, PA 17101

      Counsel for Appellees

Kathleen G. Kane, Attorney General
John G. Knorr, III, Chief Deputy Attorney General (argued)
Maryanne M. Lewis, Senior Deputy Attorney General
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

      Counsel for Appellants

_____

OPINION  OF  THE  COURT
_____

McKEE, <u>Chief Judge</u>

### Contents

I.   Facts and Procedural History ................................................................................ 6

II.   Discussion ............................................................................................................ 10

  A. Jurisdiction and Standard of Review................................................................ 10

  B. Facial versus As-Applied Challenge ................................................................ 10

  C. Fourth Amendment........................................................................................... 11

  D. Dormant Commerce Clause .............................................................................. 18

    1. Restrictions on Ownership and Alienability of
    Funeral Establishments .................................................................................. 19

    2. Preparation Room Requirement...................................................................... 28

    3. Place of Practice and Full-Time Supervisor
    Requirement ................................................................................................... 30

  E. Substantive Due Process................................................................................... 31

    1. "One-and-a-Branch" Limitation..................................................................... 32

3

2. Licensing Restrictions ..................................................................................... 33

3. "Place-of-practice" and Full-Time Supervisor
Requirement ....................................................................................................... 35

4. The Preparation Room Requirement................................................................ 36

5. Restriction on Serving Food............................................................................ 37

6. Trusting Requirement...................................................................................... 39

F. First Amendment.................................................................................................... 42

1. Restriction on Use of Trade Names ................................................................ 42

2. Payment on Commissions to Unlicensed Salespeople.................................... 45

G. Contract Clause ..................................................................................................... 47

III.    Conclusion................................................................................................................ 48

The Pennsylvania Board of Funeral Directors (the "Board") appeals the grant of summary judgment that the District Court awarded based upon its conclusion that several provisions of Pennsylvania's Funeral Director Law ("FDL"), 63 Pa. Stat. Ann. § 479.1 *et seq.*, violate various provisions of the U.S. Constitution. The suit was brought by individuals and entities who are either involved in, or wish to be involved in, Pennsylvania's "death care industry."[1] In relevant part, the Plaintiffs challenged statutory provisions that: (1) permit warrantless inspections of funeral establishments by the Board; (2) limit the number of establishments in which a funeral director may possess an ownership interest; (3) restrict the capacity of unlicensed individuals and certain entities to hold ownership interests in a funeral establishment; (4) restrict the number of funeral establishments in which a funeral director may practice his or her profession; (5) require every funeral establishment to have a licensed full-time supervisor; (6) require funeral establishments to have a "preparation room"; (7) prohibit the service of food in a funeral establishment; (8) prohibit the use of trade names by funeral homes; (9) govern the trusting of monies advanced pursuant to pre-need contracts for merchandise; and (10) prohibit the payment of commissions to agents or employees.

---

[1] The Plaintiffs-Appellees are collectively referred to as the "Plaintiffs."

4

As a threshold matter, we surmise that much of the District Court's conclusions regarding the constitutionality of the FDL, enacted in 1952, stem from a view that certain provisions of the FDL are antiquated in light of how funeral homes now operate. That is not, however, a constitutional flaw. Thus, for the reasons that follow, we reverse the District Court's judgment striking down the FDL's warrantless inspection scheme on Fourth Amendment grounds. We also reverse the District Court's judgments concerning the Plaintiffs' dormant Commerce Clause challenges to certain provisions of the FDL. We reverse as well the District Court's conclusions that the disputed FDL provisions violate the substantive component of the Due Process Clause. We also reverse the District Court's ruling that the Board's actions unconstitutionally impair the Plaintiffs' private contractual relations with third parties in violation of the Constitution's Contract Clause. We will affirm the District Court's ruling that Pennsylvania's ban on the use of trade names in the funeral industry runs afoul of First Amendment protections, but reverse its ruling that the ban on the payment of commissions to unlicensed salespeople violates the Constitution. Finally, we remand to the District Court to modify its order in accordance with this opinion.

## I.    Facts and Procedural History

The FDL was enacted in 1952 to "provide for the better protection of life and health of the citizens of [Pennsylvania] by requiring and regulating the examination, licensure and registration of persons and registration of corporations engaging in the care, preparation and disposition of the bodies of deceased persons . . . ." 63 Pa. Stat. Ann. § 479.1. The FDL created the Board, it entrusts the Board with enforcing the FDL, and "empower[s] [it] to formulate necessary rules and regulations not inconsistent with [the FDL] for the proper conduct of the business or profession of funeral directing and as may be deemed necessary or proper to safeguard the interests of the public and the standards of the profession." *Id.* § 479.16(a); *see also id.* § 479.19.

The FDL requires individuals to obtain a license to be a funeral director or own funeral homes in Pennsylvania.[2] *Id.* § 479.13(a). Generally, only licensed funeral directors or partnerships of two or more licensed funeral directors may own funeral homes. *Id.* § 479.8(a). The statute also restricts the types of individuals and entities that may obtain such licenses. However, upon the death of a licensee, the FDL authorizes the Board to issue a license to the licensee's estate

---

[2] The FDL defines "funeral director" as

> includ[ing] any person engaged in the profession of a funeral director or in the care and disposition of the human dead, or in the practice of disinfecting and preparing by embalming the human dead for the funeral service, burial or cremation, or the supervising of the burial, transportation or disposal of deceased human bodies, or in the practice of funeral directing or embalming as presently known, whether under these titles or designation or otherwise. The term "funeral director" shall also mean a person who makes arrangements for funeral service and who sells funeral merchandise to the public incidental to such service or who makes financial arrangements for the rendering of such services and the sale of such merchandise.

63 Pa. Stat. Ann. § 479.2(1).

6

for a period of three years or to the licensee's surviving spouse while s/he remains unmarried. *Id.* The statute authorizes restricted corporations ("RBCs") to obtain licenses, provided that they are formed for the sole purpose of conducting a funeral directing practice. *Id.* § 479.8(b).[3] The FDL prohibits an RBC from having an ownership interest in any other funeral establishment and requires that at least one of its principal officers be a licensed funeral director. *Id.* Upon the death of a shareholder funeral director, shares or stock of an RBC may be transferred to members of the decedent's immediate family. *Id.*

The FDL also codifies Pennsylvania's prohibition of general business corporations owning funeral directing licenses. *See id.* § 479.8(d). Prior to 1935, Pennsylvania issued funeral directing licenses to individuals as well as corporations. However, in 1935 the General Assembly imposed restrictions. Consistent with a 1936 decision of the Pennsylvania Supreme Court, *see Rule v. Price*, 185 A. 851 (Pa. 1936), the legislature eventually allowed a total of seventy-seven "pre-1935" licenses to be "grandfathered" into the new law. Currently, any person or entity—including general business corporations—may own an interest in one of these licenses and own and operate a funeral establishment pursuant to the authority granted by that license.

Licensed funeral directors are limited to operating at one principal place of business with no more than one branch location. 63 Pa. Stat. Ann. § 479.8(e). These establishments must be conducted under the name of a licensed principal or that of a predecessor establishment. *Id.* §§ 479.8(a)-(c). In addition, the FDL requires that each establishment retain a licensed funeral director as a "full-time supervisor," *id.*, and include a "preparation room . . . for the preparation and embalming of human bodies," *id.* § 479.7. Food service is generally prohibited inside a funeral establishment. Only "non-intoxicating" beverages may be served, and they may

---

[3] As defined by § 479.8(b), "[a] restricted business corporation is . . . a corporation formed by one or more licensed funeral directors specifically for the purpose of conducting a funeral directing practice and whose shareholders are licensed funeral directors or members of the immediate family of a licensed funeral director." *H.P. Brandt Funeral Home, Inc. v. Commonwealth of Pennsylvania, et al.* 467 A.2d 106, 107 (Pa. Cmwlth 1983).

only be served in rooms "not used for the preparation and conduct of [] funeral service[s]." *Id.*

As the administrative entity entrusted with enforcing the FDL, the Board's inspectors are authorized to conduct warrantless and unannounced inspections of funeral establishments. Specifically, Section 16(b) of the FDL authorizes the Board to appoint inspectors who have:

> [T]he right of entry into any place, where the business of funeral directing is carried on, or advertised as being carried on, for the purpose of the inspection and for the investigation of complaints coming before the board and for such other matters as the board might direct.

*Id.* § 479.16(b).

Finally, the FDL also contains two provisions relating to the "pre-need" sale of funeral arrangements that are at issue here.[4] First, Section 11(a)(8) of the FDL provides that a funeral director or funeral home's license may be suspended or revoked if a licensed funeral director pays unlicensed employees commissions on sales. *See id.* § 479.11(a)(8) ("The board . . . may refuse to grant, refuse to renew, suspend or revoke a license of any applicant or licensee . . . for . . . (8) paying a commission . . . to any person . . . for . . . business secured. . . ."). Second, the FDL requires that a funeral director who enters into a pre-need contract to provide funeral services deposit 100% of any advance payments into an escrow or trust account. *Id.* § 479.13(c).

In May 2008, the Plaintiffs initiated this suit against the Board, asserting claims under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 for alleged violations of their rights under the U.S. Constitution. Specifically, the Plaintiffs' amended complaint asserted that the above-referenced FDL provisions

---

[4] "'Preneed' services are what their name implies: a customer makes his or her funeral arrangements and pays for them, either in a lump sum or over time with the idea that, at the time of death, the services are fully paid for." *In re Forest Hill Funeral Home & Mem'l Park*, 364 B.R. 808, 811 (Bankr. E.D. Okla. 2007).

8

violated several constitutional provisions, including the Commerce Clause, the Contract Clause, the First Amendment, the Fourth Amendment, and the substantive component of the Fourteenth Amendment's Due Process Clause.

By way of stipulation, the parties dismissed one of the counts in the amended complaint with prejudice.[5] Thereafter, the Board and Plaintiffs both moved for summary judgment.

The District Court largely agreed with the Plaintiffs that the challenged FDL provisions violated various constitutional provisions. *See Heffner v. Murphy*, 866 F. Supp. 2d 358 (M.D. Pa. 2012). The Court struck down FDL provisions that: (1) permit warrantless inspections of funeral establishments by the Board; (2) limit the number of establishments in which a funeral director may possess an ownership interest; (3) restrict the capacity of unlicensed individuals and certain entities to hold ownership interests in a funeral establishment; (4) restrict the number of funeral establishments in which a funeral director may practice his/her profession; (5) require every funeral establishment to have a licensed full-time supervisor; (6) require funeral establishments to have a "preparation room"; (7) prohibit the service of food in a funeral establishment; (8) prohibit the use of trade names by funeral homes; (9) govern the trusting of monies advanced pursuant to pre-need contracts for merchandise; and (10) prohibit the payment of commissions to agents or employees.[6]

This appeal followed.

---

[5] The parties agreed to dismiss Count X, which claimed that the Board had arbitrarily and unreasonably restricted licensed funeral directors from securing continuing education credits online.

[6] The District Court found in the Board's favor on Count XI of the amended complaint, which alleged that certain restrictions that the FDL places on cremation violated the Plaintiffs' rights under the Commerce Clause, the First Amendment, and the Due Process Clause. *See Heffner*, 866 F. Supp. 2d at 408-18. The Plaintiffs have not appealed the District Court's ruling on this issue.

9

## II. Discussion

## A. Jurisdiction and Standard of Review

We have jurisdiction to review a district court's order granting an injunction under 28 U.S.C. § 1292(a). The District Court had federal question jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343.

We exercise plenary review over a district court's grant or denial of summary judgment. *Carter v. McGrady*, 292 F.3d 152, 157 (3d Cir. 2002). "To prevail on a motion for summary judgment, the moving party must demonstrate that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Interstate Outdoor Adver., L.P. v. Zoning Bd. of Twp. of Mount Laurel*, 706 F.3d 527, 530 (3d Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). Moreover, "where, as was the case here, the District Court considers cross-motions for summary judgment 'the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made.'" *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 925 (3d Cir. 2011) (quoting *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation marks omitted)).

## B. Facial versus As-Applied Challenge

Before we proceed to the merits of the Plaintiffs' constitutional claims, we need to address the threshold matter of whether we are reviewing a facial or an as-applied challenge to the disputed FDL provisions. The difference between the two is significant. "A party asserting a facial challenge 'must establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). This is a particularly demanding standard and is the "most difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745. By contrast, "[a]n as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010).

10

In granting summary judgment to the Plaintiffs on all but one of their asserted counts, the District Court only engaged in a facial analysis. Confusingly, however, the District Court's subsequent order invalidated those same FDL provisions both on their face and as-applied to the Plaintiffs.

When confronted with this kind of ambiguity in the past, our inquiry has examined whether the challenged statutes survive either type of challenge. *See Mitchell*, 652 F.3d at 405-06; *Marcavage*, 609 F.3d at 273. However, in those cases, the parties themselves disputed the nature of the challenges. Here, the amended complaint is generally consistent with a facial challenge and Plaintiffs' briefs exclusively advance facial challenges. This is consistent with the position Plaintiffs' counsel took at oral argument. On appeal, counsel relies on several grounds in continuing to argue that the FDL is invalid on its face. Accordingly, we will limit our inquiry to whether the challenged provisions of the FDL are facially invalid.[7]

## C. Fourth Amendment

Section 16(b) of the FDL gives board inspectors "the right of entry into any place, where the business or profession of funeral directing is carried on or advertised as being carried on, for the purpose of inspection and for the investigation of complaints coming before the board and such other matters as the board may direct." 63 Pa. Stat. Ann. § 479.16(b). Count I of the Plaintiffs' amended complaint charged that this authority to conduct warrantless searches of funeral establishments violates the Fourth Amendment.

The Supreme Court has recognized that "warrantless searches are generally unreasonable, and [] this rule applies to commercial premises as well as homes." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978). Therefore, the

---

[7] As noted above, a finding that the FDL's provisions are facially invalid negates any need to conduct an as-applied challenge. *See Salerno*, 481 U.S. at 745. If the FDL is determined to be unconstitutional *as written*, it is irrelevant whether the statute's application to a particular person under particular circumstances deprived that person of a constitutional right. *See Marcavage*, 609 F.3d at 273. Moreover, given the arguments asserted by Plaintiffs and the record before us, we conclude that an "as applied challenge" is not supported by this record.

11

government must secure a warrant before searching or inspecting private premises absent certain narrow circumstances that are not alleged here. *Showers v. Spangler*, 182 F.3d 165, 172 (3d Cir. 1999). The Board defends its authority to conduct warrantless searches by relying on the "well recognized exception" to the warrant requirement that applies to highly regulated industries. *See id.*; *see also Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 544 (3d Cir. 2012) ("Certain industries have such a history of government oversight that no reasonable expectation of privacy could exist.").

> In *New York v. Burger*, 482 U.S. 691 (1987), the Supreme Court rejected a Fourth Amendment challenge to a New York statute that authorized warrantless inspections of vehicle- dismantling businesses. The Court reasoned that the authority to inspect such businesses without a warrant came within the narrow exception to the warrant requirement for administrative inspections of closely regulated businesses. *Id.* at 703. The state had a substantial interest in regulating industries associated with motor vehicle theft, and warrantless administrative inspections advanced that interest. *Id.* at 708. The Court held that the challenged statute provided a "constitutionally adequate substitute" for warrants by informing operators of a vehicle-dismantling business that inspections will be made on a regular basis and by limiting discretion of inspection officers. *Id.* at 711.

Accordingly, we begin our Fourth Amendment inquiry by determining whether the FDL is a "closely regulated industry." *Free Speech Coal., Inc.*, 677 F.3d at 544. "Factors to consider when determining whether a particular industry is closely regulated include: duration of the regulation's existence, pervasiveness of the regulatory scheme, and regularity of the regulation's application." *Id.*

The funeral "industry" in Pennsylvania is clearly subjected to extensive regulations.[8] The FDL and its supporting regulations prescribe a broad range of standards that funeral directors in Pennsylvania have long been required to comply with. These include licensing requirements, health standards, and funeral services that funeral homes must provide. *See, e.g.*, 63 Pa. Stat. Ann. §§ 479.6 (issuance of licenses), 479.7 (health restrictions); *see also Guardian Plans v. Teague*, 870 F.2d 123, 126 (4th Cir. 1989) (describing

---

[8] Indeed, one need look no further than the breadth of the regulations being challenged by the Plaintiffs to understand the breadth of Pennsylvania's regulations of the funeral industry.

similar requirements governing funeral service professionals in Virginia as "extensive"); *Toms v. Bureau of Prof'l and Occupational Affairs*, 800 A.2d 342, 349 (Pa. Cmwlth. 2002) ("The [FDL] . . . impose[s] rules and restrictions on funeral directors not only to protect the bereaved . . . , but also to provide a framework with which to help the bereaved address each of the issues that arise when making final arrangements for a deceased loved one."). The funeral industry is also subject to significant federal regulation. Not only does the Federal Trade Commission require funeral homes to disclose pricing information prior to all transactions, *see* 16 C.F.R. 453.2, funeral establishments must also comply with several health and safety standards imposed by the Occupational Safety and Health Administration, *see, e.g.*, 29 C.F.R. 1910.1030 (Blood borne Pathogen Standard).

Since we have no difficulty concluding that Pennsylvania's funeral industry is a "closely regulated industry," our *Burger* inquiry proceeds to determining if the searches authorized by the FDL are reasonable. *Free Speech Coal., Inc.*, 677 F.3d at 544 ("Once a business is determined to be part of a closely regulated industry, then we must decide whether the alleged warrantless search was reasonable."). That inquiry requires us to focus on three criteria:

> First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made. . . . Second, the warrantless inspections must be necessary to further the regulatory scheme. . . . Finally, the statute's inspection program . . . must provide a constitutionally adequate substitute for a warrant.

*Burger*, 482 U.S. at 702-03 (internal quotation marks and citations omitted); *Free Speech Coal., Inc.*, 677 F.3d at 544.

The Plaintiffs argue that the searches authorized by the FDL are not supported by a sufficient governmental interest to withstand Fourth Amendment scrutiny under *Burger*. However, Pennsylvania obviously has a substantial interest in

13

public health, safety, and consumer protection. *See, e.g., Grime v. Dep't of Public Instruction*, 188 A. 337, 381 (Pa. 1936) (noting that the General Assembly has a legitimate interest in regulating the licensing of funeral directors in order "to protect the public health from the dangers attendant upon the inexpert conduct of undertaking by those not qualified by the necessary knowledge of principles of sanitation and disease prevention."); *Brown v. Hovatter*, 561 F.3d 357, 368 (4th Cir. 2009) ("[A] State has 'a legitimate interest in protecting the health, safety and welfare of its citizens through regulation of the funeral profession.'" (quoting *Guardian Plans, Inc.*, 870 F.2d at 126)); *Toms*, 800 A.2d at 346 ("'[T]he General Assembly has a legitimate interest in regulating the funeral industry to safeguard the interests of the public and the standards of the profession.'" (quoting *Ferguson v. Pa. State Bd. of Funeral Dirs.*, 768 A.2d 393, 397-98 (Pa. Cmwlth. 2001))).

The Plaintiffs claim that Section 16(b) of the FDL does not satisfy *Burger* because a *warrantless* search is not necessary to further the regulatory objectives. The Plaintiffs support that argument by highlighting differences between funeral homes on the one hand, and searches of premises involved in the rapid exchange of fungible items—*e.g.*, the "chop shops" at issue in *Burger*—on the other. According to the Plaintiffs, inspectors' searches of funeral establishments are likely to focus on compliance with such regulations as building standards, and the need for surprise inspections is therefore attenuated to such an extent that it cannot justify a warrantless intrusion under *Burger*.

Although that may be true, it is neither outcome determinative nor does it advance our inquiry. Although the need for unannounced inspections of funeral parlors may not be as great as for other kinds of businesses, that does not negate the need for surprise inspections of funeral parlors. The Board need not show that warrantless searches are the *most* necessary way to advance its regulatory interest. *See Contreras v. City of Chicago*, 119 F.3d 1286, 1290 (7th Cir. 1997) ("The pertinent inquiry is whether the [government's] objectives would be frustrated by requiring a warrant or notice.") (internal quotation marks and alterations omitted).

14

The Board persuasively explains that if inspectors are barred from entering funeral homes without a search warrant or advance notice, unscrupulous funeral practitioners could bring their establishments into regulatory compliance prior to an inspection, only to let them fall below prescribed standards when the threat of detection passes. We agree. Thus, Pennsylvania's warrantless search regime is not qualitatively different from various other administrative inspection schemes that depend on the element of surprise to both detect and deter violations. *See, e.g.*, *Lesser v. Espy*, 34 F.3d 1301, 1308 (7th Cir. 1994) (upholding statutory regime authorizing warrantless searches of businesses that supplied rabbits to research laboratories).

Plaintiffs also argue that Section 16(b) cannot survive the third prong of the *Burger* inquiry because it does not sufficiently limit inspectors' discretion and therefore cannot be a constitutionally adequate substitute for a warrant. The Plaintiffs base that claim on the statutory text which allows inspection for any complaints or "other matters as the board may direct[.]" 63 Pa. Stat. Ann. § 479.16(b). According to the Plaintiffs, this gives inspectors nearly absolute discretion and infringes upon the privacy interests of funeral directors. Plaintiffs stress, for example, that "no regulation or policy specifies what will be inspected or when," and they claim that the "frequency, nature, and extent of an inspection" appear to be left to an inspector's discretion. Plaintiffs' Br. at 11.

The third prong of the *Burger* test requires that a regulatory statute authorizing warrantless searches both (1) advise the owner of the premises that a search is pursuant to the law, and (2) limit the discretion of the officers conducting the search. *See Burger*, 482 U.S. at 703. "Inspectors, in other words, cannot barge into an establishment any time they want and inspect the place however they please." *Contreras*, 119 F.3d at 1291.

We agree that a delegation of authority as broad as that which Plaintiffs describe could not satisfy *Burger*. However, Plaintiffs mischaracterize Section 16(b). Their argument ignores other aspects of the statutory regime that place restrictions on warrantless searches under the FDL as required by *Burger*. The statute plainly states that any

15

business that engages (or represents itself as engaging) in the practice of funeral directing is subject to search by Board inspectors. Notice that inspections of private premises may take place "pursuant to the law" is sufficient under *Burger*, so long as limits are placed on the discretion of the inspecting officer. *See id.* at 703, 711; *see also LeSueur-Richmond Slate Corp. v. Fehrer*, 666 F.3d 261, 265 (4th Cir. 2012) ("[T]he *Burger* Court meant that a statute permitting warrantless administrative searches must clearly indicate that the [relevant] property is subject to search, whether or not any government official actually conducts one.").

Section 16(b) provides that only Board-appointed inspectors may search private premises used in the funeral business. Accordingly, the FDL more closely circumscribes who may conduct searches than the statutory regimes that the Supreme Court upheld in *Burger*. *See Burger*, 482 U.S. at 704, 711 (discussing scheme authorizing inspections "by the police or any agent of the Department of Motor Vehicles"); *see also Tart v. Commonwealth of Mass.*, 949 F.2d 490, 497 (1st Cir. 1991) (upholding scheme authorizing "any authorized person" to inspect fishing permits).

Moreover, while the FDL permits officers to inspect for "such . . . matters as the Board may direct," it exclusively restricts the Board's enforcement duties to matters pertaining to the FDL. *See* 63 Pa. Stat. Ann. § 479.16(a). As the Board correctly notes, under *Burger* we have upheld significantly broader grants of authority. *See Watson v. Abington Twp.*, 478 F.3d 144, 152 (3d Cir. 2007) (recognizing that Pennsylvania's liquor board is authorized to inspect for "'any violation of the Liquor Code or any law of the Commonwealth'" (quoting *In re Catering Club Liquor License No. CC-4837 Issued to Fulton Post, Inc.*, 438 A.2d 662, 663 (1981))); *see also LeSueur-Richmond Slate Corp.*, 666 F.3d at 266.

Plaintiffs' *Burger* challenge also relies on the absence of appropriate temporal limitation on searches of funeral establishments. The point is well taken, but we believe the absence of such restrictions is not fatal to the FDL. Time limitations, along with those related to the scope and location of a search, are key to restricting inspectors' discretion. *See Burger*, 482 U.S. at 703. Accordingly, courts reviewing

16

regulatory search schemes under *Burger* generally look to whether the statutes and regulations at issue place adequate temporal limits on government officers' ability to conduct searches of private property. Here, neither Section 16(b) of the FDL nor relevant Board regulations establish any such limitations—*e.g.*, by requiring that officers conduct inspections during normal business hours.

However, context matters and courts have consistently upheld statutes permitting administrative searches in the absence of time restrictions where such limitations would frustrate the underlying governmental interest. *See United States v. Vazquez-Castillo*, 258 F.3d 1207, 1212 (10th Cir. 2001) (upholding regulatory inspection scheme on commercial carriers and noting that "trucks operate twenty-four hours a day") (internal quotation marks omitted); *Crosby v. Paulk*, 187 F.3d 1339, 1347 (11th Cir. 1999) (upholding statute authorizing inspections of properties where alcohol was sold and permitting Georgia officers to "enter upon the licensed premises . . . at any time" (emphasis omitted) (quoting O.C.G.A. § 3-2-32)); *United States v. Dominguez-Prieto*, 923 F.2d 464, 470 (6th Cir. 1991) (noting "limitation [on searches of commercial carriers] would . . . render the entire inspection scheme unworkable and meaningless").

Obviously, the concerns that lead to the regulation of funeral facilities do not disappear at the close of business, nor is the need for regulatory compliance restricted to business hours. In fact, just the opposite may be true. It is quite reasonable for the state to assume that owners of funeral businesses will be particularly careful to avoid disturbing or offending visitors and family members who are already grieving the loss of a loved one. However, the health concerns that underlie much of the FDL's regulatory scheme do not dissipate when those visitors and family members leave the funeral home. Death is obviously not restricted to normal business hours and a funeral facility must continually maintain the corpse until it is finally removed. Therefore the state has a strong interest in ensuring that the funeral business complies with applicable regulations 24 hours a day, 7 days a week. Limiting regulatory inspections to business hours would not advance that interest.

In mounting a facial challenge to the FDL, Plaintiffs must persuade us that "there is no set of circumstances" under which the FDL's inspection scheme may be applied constitutionally. *See Mitchell*, 652 F.3d at 415-16. Plaintiffs have failed to do so. As we have just explained, the very fact that death is not restricted to normal business hours or workdays belies any suggestion that administrative searches of funeral parlors should be so restricted. Given the totality of the FDL's warrantless administrative inspection scheme, we hold that the statute adequately limits the discretion of government officers.[9]

## D.  Dormant Commerce Clause

> The Commerce Clause of the U.S. Constitution grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. Art. I, § 8, cl.3. "This clause has an implied requirement—the Dormant Commerce Clause—that the states not 'mandate differential treatment of in-state and out-of-state economic interests that benefit the former and burdens the latter.'" *Keystone Redev. Partners, LLC v. Decker*, 631 F.3d 89, 107 (3d Cir. 2011) (quoting *Granholm v. Heald*, 544 U.S. 460, 472 (2005)). Accordingly, it is "[a]xiomatic . . . that a state cannot impede free market forces to shield in-state businesses from out of state competition." *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 (3d Cir. 2002) ("*Cloverland I*").

Our dormant Commerce Clause inquiry begins with determining whether the FDL discriminates against interstate commerce in either purpose or effect. *See Am. Trucking Ass'n, Inc. v. Whitman*, 437 F.3d 313, 319 (3d Cir. 2006). If so, the discriminatory restrictions must then survive heightened scrutiny to survive the Plaintiffs' Commerce Clause challenge. *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 372 (3d Cir. 2012).

---

[9] In addition, we note that nothing in the record suggests that Board officers have conducted inspections of funeral homes outside of normal business hours. Indeed, the Board asserts—and the Plaintiffs concede—that because government inspectors are only paid for work performed between 8:30 a.m. and 5:00 p.m., administrative inspections have exclusively taken place during those hours.

18

Heightened scrutiny requires the State to "'demonstrate (1) that the statute serves a legitimate local interest, and (2) that this purpose could not be served as well by available nondiscriminatory means.'" *Freeman v. Corzine*, 629 F.3d 146, 158 (3d Cir. 2010) (quoting *Am. Trucking Ass'n, Inc.*, 437 F.3d at 319).

If we determine that heightened scrutiny is inappropriate because the FDL's provisions do *not* discriminate in favor of in-state interests, we then must balance interests pursuant to *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Pike* balancing is necessary because "[s]tates may not impose regulations that place an undue burden on interstate commerce, even where those regulations do not discriminate between in-state and out-of-state businesses." *United States v. Lopez*, 514 U.S. 549, 579-80 (1995). The *Pike* balancing inquiry requires that we determine "whether the [law's] burdens on interstate commerce substantially outweigh the putative local benefits.'" *Freeman*, 629 F.3d at 158 (quoting *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 258 (3d Cir. 2006) (alterations omitted) ("*Cloverland II*")). Here, the District Court concluded that several of the FDL's provisions unconstitutionally shielded Pennsylvania funeral establishments from out-of-state competition in violation of the Commerce Clause. In explaining why we disagree with that conclusion we will separately discuss each of the allegedly discriminatory provisions.

## 1. Restrictions on Ownership and Alienability of Funeral Establishments

The Plaintiffs first argue that FDL's limits on the ownership of funeral establishments in Pennsylvania violate the dormant Commerce Clause. The first challenged restriction that we will discuss is referred to as the "one-and-a-branch" limitation. It restricts licensees to possessing an ownership interest in one funeral establishment with only a single "branch" location. 63 Pa. Stat. Ann. §§ 479.8(a)-(e).

The second limitation that is challenged under the dormant Commerce Clause arises from a *set* of provisions governing funeral licensing requirements in Pennsylvania.

These provisions generally restrict ownership of an interest in funeral establishments to individuals and entities that had a license before 1935. *See id.* §§ 479.8(a)-(c). However, as we explained earlier, notwithstanding this limitation, these ownership provisions allow the estate of a deceased licensee or surviving spouse to receive a license to continue the business of the deceased licensee. Similarly, immediate family members may hold a deceased funeral director's stock in a restricted corporation upon death of the licensee.

The District Court did not independently analyze the one-and-a-branch limitation in concluding that these "ownership restrictions" violated the dormant Commerce Clause. We will nevertheless examine the constitutionality of each of the ownership restrictions.

### a. One-and-a-Branch Provision

The one-and-a-branch provision states that "[l]icensees authorized to conduct a funeral practice . . . may practice at one principal place and no more than one branch place of business." *Id.* § 479.8(e). Other provisions, in Section 8 of the FDL, similarly restrict business entities' ownership interests. *See id.* §§ 479.8(a), (b), (d). The Plaintiffs allege that these provisions unconstitutionally prohibit out-of-state interests from operating a funeral business at more than two locations. Plaintiffs claim that the unconstitutionality results from the resulting inability to "cluster"[10] facilities so that they can more effectively compete with in-state funeral directors.

We begin our analysis by asking "whether [the State law] discriminates on its face against interstate commerce." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). The answer to that question is as obvious as it is straightforward. Despite Plaintiffs' attempt to conjure up a discriminatory impact on out-of-state funeral owners, it is clear from the text of the

_____

[10] Plaintiffs define "clustering" as the sharing of employees and equipment between multiple locations. Plaintiffs' Br. at 26. Plaintiffs contend that the prohibition on clustering -- *i.e.*, limiting the extent to which the services of a funeral director can be shared across a cluster of funeral homes -- means that a firm attempting to cluster in Pennsylvania is required to hire more personnel at greater expense. *See Heffner*, 866 F. Supp. 2d at 396.

statute that the challenged provisions impose the same limitation on out-of-state funeral directors *and* those in Pennsylvania. There is simply no distinction under the FDL between in-state and out-of-state interests or impact. The restriction burdens both to the same extent. Any burden that results from these limitations affects *all* licensed individuals who possess an ownership interest in a funeral business operated in Pennsylvania regardless of the state of residency of any of its owners.

Our dormant Commerce Clause inquiry only considers whether the impact of the limitation falls equally upon in-state and out-of-state funeral directors; if so, there is clearly no discrimination in favor of Pennsylvania operators. *See Sixth Angel Shepherd Rescue, Inc. v. West*, 477 F. App'x 903, 907 (3d Cir. 2012) (noting that, under the dormant Commerce Clause analysis, "we ask whether a challenged law discriminates against interstate commerce . . . [but a]bsent discrimination for the forbidden purpose . . . the law will be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.") (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338-39 (2008) (internal quotations and citations omitted).

By way of example, a Pennsylvania resident who is a licensed funeral director in Pennsylvania and a Maryland resident who is a licensed funeral director in Pennsylvania are similarly barred from owning an interest in more than two funeral establishments in Pennsylvania. In-state funeral parlor owners who want to achieve an economy of scale through "clustering" face the same obstacles as out-of-state owners who want to cluster.[11]

---

[11] The Plaintiffs describe clustering as "the primary competitive advantage of [] out-of-state competitors." Plaintiffs' Br. at 25. Although the record contains evidence that supports the alleged consumer benefits flowing from an economy of scale business model, the record does not support the contention that the FDL's interposition of an obstacle to clustering unilaterally advances the interest of Pennsylvania funeral establishments.

We realize, of course, that the vast majority of individuals who apply for and obtain a Pennsylvania funeral directing license will probably reside in-state in order to practice their trade. Indeed, like the one-and-a-branch provision, many of the FDL's requirements may render that choice all but inevitable. However, that does not elevate the resulting choice to the level of unconstitutional coercion under the dormant Commerce Clause. The funeral

21

service "industry," involving the internment and cremation of consumers' loved ones, is by nature a highly localized enterprise. So long as a State's regulation operates evenhandedly as to both in-state and out-of-state actors seeking to enter such an industry, we do not subject it to heightened scrutiny under dormant Commerce Clause analysis. *See Am. Trucking Assocs., Inc.*, 545 U.S. at 437 (in upholding Michigan's annual fee assessed on trucks engaged in intrastate commercial freight, the court noted the disputed provision "taxe[d] purely local activity; it does not tax an interstate truck's entry into the State nor does it tax transactions spanning multiple States"); *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987) (holding Indiana statute regulating acquisition of corporation stock did not merit heightened scrutiny because it had "same effects on tender offers whether or not the offeror is a domiciliary or resident of Indiana").

Accordingly, we hold that the one-and-a-branch restriction does not discriminate against out-of-state interests, and we thus reject the Plaintiffs' contention that we should subject the applicable provisions of the FDL to heightened scrutiny. *See McBurney v. Young*, 133 S. Ct. 1709, 1719 (2013) (noting dormant Commerce Clause jurisprudence "is driven by a concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors'" (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 268, 273-74 (1988)).

Having determined that the one-and-a-branch limitation does not discriminate against out of state interests, we need only determine whether it can withstand scrutiny under the *Pike* balancing test. *See Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008). We believe that it does. The "incidental burdens" that we must assess under *Pike* consist of "the degree to which the state action incidentally discriminates against interstate commerce relative to intrastate commerce." *Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 406 (3d Cir. 1987). As we have just explained, the FDL's one-and-a-branch restriction imposes the very same burdens on Pennsylvania funeral directors as it imposes on out-of-state interests. Thus, the regulation here is a burden on commerce without discriminating against *interstate* commerce. *See Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 826-27 (3d Cir. 1994) ("[W]here the burden on out-of-state interests rises no higher than that placed on competing in-state interests, it is a burden on *commerce* rather than a burden on *interstate* commerce.") (emphasis in original).

22

### *b.  Licensing Restrictions*

The Plaintiffs contend that the FDL's restrictions on who may obtain a funeral director license violate the dormant Commerce Clause.  Usually, a funeral establishment in Pennsylvania may be owned by a licensed funeral director who, in turn, may operate the business as a sole proprietorship, a partnership (with one or more licensed funeral directors), or a restricted business corporation established for the sole purpose of providing funeral services. General business corporations are barred from owning a funeral home in Pennsylvania unless they are able to obtain one of 76 existing "pre-1935" licenses issued before the ban on corporations went into effect.  The law carves out limited exceptions and allows certain unlicensed individuals and entities—namely, the spouses, children, grandchildren, surviving spouse, or estate of a deceased licensed funeral director—to own and operate funeral homes in Pennsylvania. However, they may only do so if they employ a full-time licensed funeral director as supervisor.   63 Pa. Stat. Ann. § 479.8(a).

The District Court agreed with the Plaintiffs' contention that this scheme effectively bans out-of-state entities from owning funeral homes within Pennsylvania   and subjected the ownership restrictions to heightened scrutiny. The Court then ruled that the restrictions could not survive the resulting inquiry. Alternatively, the Court found that even if heightened scrutiny was not appropriate, the FDL's licensing restrictions could not survive *Pike* balancing. *See Heffner*, 866 F. Supp. 2d at 387.  We disagree with both conclusions.

*Any* individual or entity can obtain the required license to operate a funeral home in Pennsylvania as long as certain requirements are satisfied.  None of those requirements mandate state residency or citizenship. *See id.* at 388 (noting "an out-of-state individual may obtain a Pennsylvania funeral license by complying with the requirements for applicants"). Similarly, the statutory exceptions to the rule that only licensed individuals may own funeral homes in Pennsylvania provide that surviving family members of a deceased funeral director may own interests in a restricted business corporation regardless of their state of residency.

Concomitantly, a general business corporation that does not own a "pre-1935" license is ineligible for a license

regardless of where it is domiciled. Therefore, we cannot agree that the FDL's ownership provisions "erect a barrier" protecting in-state interests from out-of-state competition that would trigger heightened scrutiny. *See Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951); *see also Keystone Redev. Partners, LLC*, 631 F.3d at 108.

The limitation on licensing also survives the *Pike* balancing test. As noted above, when we engage in *Pike* balancing, we consider whether any incidental burdens that the FDL's ownership and license restrictions place on the flow of interstate commerce outweigh the statute's putative local benefits. *See Norfolk S. Corp.*, 822 F.2d at 405-06. Here, Plaintiffs again posit that the FDL's ownership restrictions burden interstate commerce by requiring out-of-state interests to be licensed in order to own or operate funeral homes in Pennsylvania while excepting deceased licensed funeral directors' families from that obligation. The Board articulates three countervailing benefits of these restrictions: (1) disfavoring ownership of funeral homes by unlicensed individuals or corporations; (2) advancing the public interest in the continued operation of a funeral home after the licensee's death; and (3) alleviating the financial loss to survivors who, on the death of a licensed director, might find themselves with a funeral home which they could neither operate nor sell at a fair price.

The situation here is analogous to that which confronted the Court of Appeals for the Fourth Circuit in *Brown v. Hovatter*, 561 F.3d 357 (4th Cir. 2009). There, the court rejected a dormant Commerce Clause challenge to Maryland's Morticians and Funeral Directors Act. That statute, like the FDL, required all individuals who desired to practice mortuary science in Maryland be licensed by the State's Board of Morticians. Md. Health Occ. Code § 7-301(a). Only the surviving spouses or executors of the estates of deceased licensed individuals could own a funeral establishment without a license. *Id.* §§ 7-310(c)(2), 7-308, 7-308.1. Maryland's law also prohibited licensing corporations but carved out an exception for corporations grandfathered under an earlier version of the statute. *Id.* § 7-310. The plaintiffs in *Brown* also argued that they should be able to own and operate funeral establishments without being

24

individually licensed or going through general purpose corporations. *Brown*, 561 F.3d at 360.

In rejecting that argument, the Court explained:

> Any person—out-of-state or in-state—may obtain a license to practice mortuary science and own and operate a funeral establishment in Maryland, and there is no limit on the number of licenses that the State may issue. Likewise, with respect to the [] grandfathered corporations owning licenses, any person or corporation, out-of-state or in-state, may own the stock.

*Id.* at 364. After surveying the alleged restrictions that Maryland placed on licenses, the *Brown* Court concluded that "entry into the Maryland funeral services market is limited only by the choices of the individual as to how best to allocate his or her time and resources." *Id.*

Were we to substitute "Pennsylvania" for "Maryland" in the above-quoted text, we could easily adopt the Fourth Circuit's description of the operation of Maryland's Morticians Act as our analysis of the corresponding provisions of the FDL. Contrary to the Plaintiffs' characterization of the effect, the FDL's licensing and ownership restrictions affect in-state and out-of-state players equally.

The Plaintiffs highlight four alleged "significant differences" between the Maryland Morticians Act and the Pennsylvania FDL in an attempt to distinguish *Brown*. They argue: (1) Maryland does not allow ownership by unlicensed spouses, children, and grandchildren of funeral directors and their trusts; (2) unlike Maryland, Pennsylvania allows corporate ownership of funeral homes through RBCs; (3) Maryland does not limit the number of funeral homes that may be owned, whereas Pennsylvania's one-and-a-branch restriction limits ownership to two locations; and (4) Maryland does not allow the "Pinkerton rule," a well-recognized (and Board-acknowledged) way to circumvent the FDL's limitations that allows a licensee to "own" more than two locations by ceding his or her stock in other homes to third parties while retaining ownership over the establishments' assets.

25

These purported differences are neither significant nor persuasive. The first claim is only partially correct—Maryland allows the executors and surviving spouses of deceased licensed funeral directors to own and operate a funeral establishment. *See* Md. Health Occ. Code §§ 7-310(c)(2), 7-308, 7-308.1. The fact that Maryland does not extend similar benefits to the children and grandchildren of licensed funeral directors is of little import. The second distinction is no less relevant to our analysis. We do not agree with the level of importance that the Plaintiffs ascribe to Pennsylvania's choice to allow restricted business corporations to own funeral homes within the State because that provision of the FDL applies equally to in-state and out-of-state interests. Indeed, the provision appears to *expand* access to the relevant market rather than contracting it as the Plaintiffs claim. Moreover, we have already explained why the third purported distinction (Pennsylvania's one-and-a-branch limitation) does not excessively burden interstate commerce. Finally, that licensees—whether they reside in-state or out-of-state—may avail themselves of the "Pinkerton rule" or other existing "end-runs" to circumvent the FDL's express requirements says nothing about the constitutional validity of those provisions for purposes of a dormant Commerce Clause analysis. The fact that some potential owners of funeral homes can circumvent the goals of the FDL through the Pinkerton mechanism also fails to establish a scheme that favors Pennsylvania businesses and residents. The Pinkerton end-run operates the same way for in-state and out-of-state businesses and residents.

Under the FDL, any individual—out-of-state or in-state—may apply for and obtain the applicable license as long as they satisfy general requirements relating to citizenship, professional education, and experience. *See* 63 Pa. Stat. Ann. §§ 479.3(a)-(f). Once an applicant satisfies these requirements, that individual—whether he or she resides in Pennsylvania or elsewhere—may be licensed as a "Pennsylvania funeral director" and is entitled to the same benefits that the FDL grants all other licensees regardless of state of residence. The unlicensed surviving spouse of a deceased funeral director who resides in Ohio but routinely commutes to Pennsylvania to operate a funeral establishment that s/he owned, for example, is statutorily entitled to the same license under Section 479.8(a) as the surviving spouse of a funeral director residing in-state.

To be sure, this scenario likely represents the exception and not the norm; as this record attests, the vast majority of funeral directors who obtain a license to practice in Pennsylvania will no doubt choose to reside in the Commonwealth because of convenience or economic necessity. However, this does not evidence any burden on interstate commerce nor discrimination against out-of-state operators. Rather, there is nothing on this record to suggest that this is a reflection of anything other than the nature of the

26

funeral business.  "The practice of mortuary science is," after all, "inherently a local profession."  *Brown*, 561 F.3d at 363.

Moreover, as we have explained,  "virtually all state regulation involves increased costs for those doing business within the state, including out-of-state interests doing business in the state . . . .  In this absolute sense, virtually all state regulation 'burdens' interstate commerce."  *Norfolk S. Corp.*, 822 F.2d at 406.  Thus, our examination of a statute's burden on interstate commerce must focus on whether regulatory scheme results in an *excessive* burden on interstate commerce.  That inquiry is informed by whether a State has "unjustifiably [] discriminate[d] against or burden[ed] the interstate flow of articles of commerce."  *Or. Waste Sys., Inc. v. Dep't of Envi. Quality of State of Or.*, 511 U.S. 93, 98 (1994).

We do not believe that the licensing requirements of the FDL run afoul of that limitation.  The State has made a rational decision that consumers in need of funeral services are better served by licensed individuals who, in the usual case, are not shielded by the cloak of corporate ownership.  *Cf. N.D. State Bd. of Pharma. v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 166-67 (1973) ("'A standing criticism of the use of corporations in business is that it causes such business to be owned by people who do not know anything about it.'" (quoting *Louis K. Liggett Co. v. Baldridge*, 278 U.S. 105, 114-15 (1928))); *see also Brown*, 561 F.3d at 367.  We cannot "accept [the] notion that the Commerce Clause protects the particular structure or methods of operation in a retail market . . . .  [T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."  *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127-28 (1978); *see also McBurney v. Young*, 667 F.3d 454, 469 (4th Cir. 2012) (rejecting dormant Commerce Clause challenge where state law "prevent[ed] [plaintiff] from using his 'chosen way of doing business,' but [did] not prevent him from engaging in business in the [State]").

Similarly, although Pennsylvania has carved out limited exceptions to its own rule by allowing unlicensed family members to participate in the ownership of a funeral home, those exceptions—enacted with the twin purposes of

ensuring that a funeral establishment continues to serve the community after the death of a licensed funeral director and protecting the deceased's director's family—do not impose burdens (excessive or otherwise) on the flow of interstate commerce. We therefore conclude that the District Court erred in ruling that that the FDL's licensing and ownership restrictions violate the dormant Commerce Clause.

## 2. Preparation Room Requirement

Section 7 of the FDL provides that "every establishment in which the profession of funeral directing is carried on shall include a preparation room, containing instruments and supplies for the preparation and embalming of human bodies." 63 Pa. Stat. Ann. § 479.7. The Plaintiffs claim that this provision violates the dormant Commerce Clause by protecting established in-state funeral homes at the expense of out-of-state interests seeking to enter the market. According to Plaintiffs, the preparation room requirement deprives out-of-state competitors of any competitive advantage that they could otherwise gain from consolidating embalming operations in one centralized facility from which they could service other locations.[12]

Here again, the Plaintiffs' challenge ignores the fact that any impediments arising from the preparation room requirement burden *all* funeral directors operating in Pennsylvania. Out-of-state entities are not specifically targeted, deprived of a competitive advantage, nor afforded a competitive advantage compared to Pennsylvania businesses. *See Cloverland II*, 462 F.3d at 263; *see also Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 49 (2d Cir. 2007). Indeed, to the extent that the preparation room requirement has an effect on interstate commerce, it is incidental at most. Consequently, the provision will only violate the dormant Commerce Clause if it does not survive *Pike* balancing—*i.e.*, if its burdens on interstate commerce "clearly outweigh" its putative local benefits. *See Dep't of Revenue of Ky.*, 553 U.S. at 353.

---

[12] The Plaintiffs do not allege that the FDL's preparation room requirement is discriminatory on its face, but in its operation.

The "burden" that the preparation room requirement imposes on interstate commerce consists of the cost of equipping each funeral establishment with a preparation room and the resulting impediment that arises from requiring "centralized" embalming facilities. We do not doubt that these burdens can be significant.[13] However, they are not so significant as to "clearly outweigh" the State's asserted interests in minimizing the time between death and embalming, reassuring customers that the remains of their loved ones will be in the funeral home's custody at all times, minimizing the possibility of accidents in-transit between embalming facilities, and ensuring accountability.

Moreover, although the Plaintiffs make much of the State's apparent admission that the preparation room requirement is either unnecessary or unduly burdensome, Plaintiffs fail to realize that the concession is without constitutional significance. Specifically, the Plaintiffs point to a 2008 legislative initiative in which the Board advocated for the repeal of the preparation room requirement because of the economic benefits of dispensing with the policy. The Plaintiffs also highlight a 1994 Audit Report, which said that requiring each funeral home to have its own preparation room was "burdensome and unnecessary" and noted the resulting additional costs to funeral directors and consumers. J.A. 846.

There are two reasons why this concession lacks the constitutional significance that Plaintiffs attach to it. First, the recommendation that the preparation room requirement be repealed appears to have resulted from the requirement's intrastate economic impact. The Report is therefore not particularly helpful to our focus on the burdens on *inter*state commerce as required under *Pike*. *See C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 430 (1994) ("[L]ocal burdens are not the focus of the dormant Commerce Clause . . . ."). Second—and more importantly—neither the Board's views in the above-referenced 2008 legislative initiative nor the Audit Report's recommendation to repeal the preparation room requirement were enacted into law. Thus, notwithstanding any reservations that some

---

[13] The Plaintiffs estimate the costs of establishing a preparation room to be approximately $220,000 to a funeral home during its first year.

Pennsylvania officials might have expressed in the past, the preparation room requirement remains the law of Pennsylvania.[14]

### 3.    Place of Practice and Full-Time Supervisor Requirement

Section 7 of the FDL provides that a "license shall authorize the conduct of the [funeral directing] profession at the particular place of practice thereon and no other."  63 Pa. Stat. Ann. § 479.7.  Somewhat confusingly, this section also provides that a funeral director is free to "assist another duly licensed person, partnership or corporation[.]"  Presumably, this applies to assisting at another branch location.  *Id.*  In addition, Section 8(e) mandates that each branch location must retain a licensed funeral director as a "full-time supervisor."  *Id.* 479.8(e).  However, a funeral director may not supervise more than one location.  *Id.* § 479.2(11).  In Counts V and VI of the amended complaint, the Plaintiffs alleged that both the FDL's "place-of-practice" restrictions and full-time supervisor requirement violate the dormant Commerce Clause.  Once again, the District Court agreed. *See Heffner*, 866 F. Supp. 2d at 397-99.

The Plaintiffs claim that these provisions facially discriminate against out-of-state interests and must therefore be subjected to heightened scrutiny.  They allege that, under the place-of-practice provision, a funeral director who practices at one location in another state would be precluded from practicing in Pennsylvania because that would constitute practicing at a second location.  According to the Plaintiffs, a

---

[14] In addition, the opinions that the Board may have expressed in the past in its capacity as an administrative arm of the Commonwealth may inform judicial inquiry into whether the full-time supervisor requirement excessively burdens interstate commerce, but it does not end it.  The 2008 legislative initiative simply does not have the force of Commonwealth law.  Unlike a statute or Board-issued regulation, it does not embody official Commonwealth policy, but only the views that the Board saw fit to communicate to the Pennsylvania legislature at a particular time.  *See Shannon v. United States*, 512 U.S. 573, 584 (1994) ("'[C]ourts have no authority to enforce a principle gleaned solely from legislative history that has no statutory reference point.'" (quoting *Int'l Bhd. of Elec. Workers, Local Union 474 v. NLRB*, 814 F.2d 697, 712 (1987) (alterations omitted))); *see also Abrego v. Dow Chem. Co.*, 443 F.3d 676, 686 (9th Cir. 2006) (per curiam) (discounting importance of legislative silence "coupled with a sentence in a legislative committee report untethered to any statutory language").

funeral director who manages a location in another state would be similarly barred from obtaining a funeral supervisor license in Pennsylvania. Plaintiffs' argument is supported by a letter from the Board denying a New Jersey applicant's request for a funeral supervisor license on these grounds. J.A. 1455.

We decline to adopt Plaintiffs' reasoning as to these provisions. We recognize that the FDL's place-of-practice restriction and full-time supervisor requirement compel a funeral director to relinquish one operating license in favor of another, should he or she wish to supervise another location. § 479.2(11). However, we disagree that this provision facially discriminates against out-of-state interests. Having to surrender an out-of-state license to practice in Pennsylvania is simply the result of the operation of the one-and-a-branch rule, and the limits it places on being an owner and/or supervisor of a funeral home. Moreover, Pennsylvania residents *also* have to surrender an existing license in order to operate more than the two establishments allowed under the restriction. Thus, it makes no difference where the funeral homes or owners are located.

## E. Substantive Due Process

The Fourteenth Amendment Due Process Clause prohibits the states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. The prohibition has both a procedural and substantive component. *See Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 846 (1992); *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Plaintiffs have continually alleged that several of the FDL's provisions violate their right to substantive due process.

Unless a legislative enactment abridges "certain fundamental rights and liberty interests," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), we apply a more lenient "rational basis" inquiry, *Roe v. Wade*, 410 U.S. 113, 173 (1973), in determining the statute's constitutionality. Here, Plaintiffs concede that we should apply rational basis review to their substantive due process challenge.

Under rational basis review, "'a statute withstands a substantive due process challenge if the state identifies a legitimate state interest that the legislature could rationally conclude was served by the statute.'" *Alexander v. Whitman*, 114 F.3d 1392, 1403 (3d Cir. 1997) (quoting *Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 645 (3d Cir. 1995)). We have repeatedly warned that rational basis review is by no means "toothless"—"[a] necessary corollary to and implication of rationality as a test is that there will be situations where proffered reasons are not rational." *Doe v. Pa. Bd. of Prob. & Parole*, 513 F.3d 95, 112 n.9 (3d Cir. 2009); *see also Murillo v. Bambrick*, 681 F.2d 898, 905 n.15

(3d Cir. 1982). Nevertheless, rational basis review allows legislative choices considerable latitude. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). A governmental interest that is asserted to defend against a substantive due process challenge need only be plausible to pass constitutional muster; we do not second-guess legislative choices or inquire into whether the stated motive actually motivated the legislation. *See United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("Where . . . there are plausible reasons for Congress' action, our inquiry is at an end. It is . . . 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision' . . . ." (quoting *Flemming v. Nestor*, 363 U.S. 603, 612 (1960))).

Thus, as we recently explained, "'the rationality requirement [is] largely equivalent to a strong presumption of constitutionality.'" *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213 (3d Cir. 2013) (quoting Laurence H. Tribe, American Constitutional Law § 16-2, at 1442-43 (2d ed. 1988)).

## 1. "One-and-a-Branch" Limitation

In addition to the dormant Commerce Clause challenge discussed above, the Plaintiffs also attack the one-and-a-branch limitation on substantive due process grounds. The Board argues that the limitation advances five legitimate state interests. Those interests are: (1) diversifying the ownership of funeral establishments; (2) preventing a single firm from dominating a local market through "clustering"; (3) limiting the damage to consumers and a community from the possible failure of a single firm; (4) promoting familiarity and accountability between funeral directors and their consumers; and (5) preventing licensees from being "spread too thin." We perceive no substantive difference in the first three goals and will treat them as the same legislative objective for purposes of our analysis.[15]

These goals are clearly legitimate. "[A] state has a 'legitimate interest in protecting the health, safety and welfare of its citizens through regulation of the funeral profession[;]'" *Brown*, 561 F.3d at 368 (quoting *Guardian Plans*, 870 F.2d at 126), and the Pennsylvania legislature could have reasonably concluded that these objectives advance those interests. Accordingly, the one-and-a-branch limitation will survive rational basis review unless the State legislature could not rationally conclude that the provision furthered these ends.

The Plaintiffs make several arguments to support their contention that the one-and-a-branch restriction does not reasonably advance the State's stated objectives. For example, they claim that restricting the number of locations that a licensee may own (to two) does not rationally prevent a funeral director from being "spread too thin," since s/he may still have to perform thousands of funerals a year at the locations that are licensed. The Plaintiffs also note that a funeral director could effectively own a potentially unlimited number of homes by employing loopholes like the so-called "Pinkerton rule," thereby allowing a single firm to *de facto* dominate a local market and thus undermine the goal of limiting the damage to consumers when a firm that is "too big to fail" does, in fact, fail.[16]

---

[15] Diversification is merely one of the ways that the Commonwealth is trying to advance the second and third objectives.

[16] As we explained above, the "Pinkerton rule" refers to the practice of allowing a licensee to circumvent the one-and-a-branch restriction by transferring his or her stock in a funeral establishment to another entity or individual while

However, the one-and-a-branch limitation is not constitutionally infirm merely because its response to legitimate governmental concerns is imprecise and imperfect. "[U]nder the deferential standard of review applied in substantive due process challenges to economic legislation there is no need for mathematical precision in the fit between justification and means." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 639 (1993). Therefore, the one-and-a-branch limitation can survive our substantive due process inquiry even though it neither targets all applicable threats nor succeeds in preventing all of them. Despite the limitation's imperfection, the State could have rationally concluded that limiting licensees to owning funeral businesses at no more than two locations would limit the number of consumers that a director could service and avoid the problems that could arise when a funeral director is "spread too thin." All that is necessary is that the selected means is rationally linked to the stated ends. *See Stretton v. Disciplinary Bd. of Supreme Court of Pa.*, 944 F.2d 137, 146 (3d Cir. 1991) ("A state is permitted to take steps . . . that only partially solve a problem without totally eradicating it.").

Similarly, the fact that Pennsylvania's current statutory and regulatory scheme does not prevent licensees from sidestepping the limitation by seizing upon loopholes such as the "Pinkerton rule" is not constitutionally fatal. "'A legislature need not . . . risk [] losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked.'" *Parker v. Conway*, 581 F.3d 198, 202 (3d Cir. 2009) (quoting *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 809 (1969)). We therefore conclude that the FDL's one-and-a-branch limitation easily weathers scrutiny under rational basis review.

## 2. Licensing Restrictions

The Plaintiffs also raise a substantive due process challenge to the other restrictions in the FDL that we have discussed above as part of our dormant Commerce Clause discussion. Specifically, the Plaintiffs argue that the State acted irrationally in limiting ownership of funeral homes to licensed funeral directors while barring general business corporations from obtaining the required license. 63 Pa. Stat. Ann. § 479.8(a). Here, as before, the Plaintiffs highlight the FDL's "exceptions," which allow the administrators of a deceased licensee's estate and his or her surviving spouse and family members to possess an ownership interest in a funeral establishment under specific circumstances, whether or not they possess a funeral directors' license.[17] Plaintiffs contend that these exceptions belie the Board's asserted interest in promoting consumer protection, accountability, competency, trust, and accessibility. Rather,

---

retaining ownership over the establishment's assets. Since the Board has recognized that the FDL does not restrict who may own or lease the assets necessary to operate a funeral home, this "loophole" would presumably allow a licensee to *de facto* "own" an unlimited number of funeral homes within the Commonwealth.

[17] As explained, administrators of a licensee's estate may possess an ownership interest for a maximum of three years. Widows and widowers may own an interest in a funeral home for an indefinite period so long as they remain unmarried. Section 8(b)(4) of the FDL allows immediate family members of a deceased licensed funeral director or shareholder to own shares of an RBC.

according to Plaintiffs, these exceptions demonstrate that the licensing requirement is not rationally related to those objectives.

The argument incorrectly presupposes that Pennsylvania's response to its stated objectives had to be limited to addressing a single objective at a time. An otherwise rational legislative response to a given concern cannot be invalidated under the Due Process Clause merely because the chosen solution creates other problems while addressing the original concern. Rather, legislatures are generally free to consider and balance several interests in carrying out their legislative responsibilities. *See, e.g.*, *Salazar v. Buono*, 130 S. Ct. 1803, 1817 (2010) (noting "Congress's prerogative to balance opposing interests"); *Dennis v. United States*, 341 U.S. 494, 539-40 (1951) ("How best to reconcile competing interests is the business of legislatures . . . ."); *see also Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1035 (3d Cir. 1987) (noting "process of democratic political decision-making often entails [] accommodation of competing interests"). Accordingly, where, as here, a State does not infringe upon fundamental rights or interests, it may address multiple or even competing objectives as long as its actions are rationally related to legitimate legislative objectives.

Throughout this litigation, the Board has consistently reasoned that the exceptions to the FDL's licensing requirement address Pennsylvania's distinct interest in protecting the livelihood of a licensed director's surviving family members and the interests of the community in a funeral home's continued operation following the death of the owner. It is not at all difficult to see how the licensing exceptions that the Plaintiffs have chosen to attack address that legitimate governmental interest – albeit imperfectly. In upholding Maryland's Mortician's Act against a similar Due Process challenge in *Brown v. Hovatter*, the Court explained "exemptions" to Maryland's licensing requirement that allowed unlicensed surviving spouses and executors of deceased licensed morticians to possess an ownership in funeral establishments as follows:

> [C]orporations that historically held licenses in the funeral business were allowed to continue to hold licenses because the General Assembly wanted to protect reliance interests of family members. For a similar reason, spouses of deceased licensees are exempted from being licensed to allow the spouse, who presumably was already involved in the affairs of the business, to continue the business. The Act also provides an exemption for executors of licensees, allowing the temporary operation of the funeral establishment to wind down the affairs of the business. The fact that the General Assembly created these rational exemptions does not undermine the overall rationality of the Morticians Act based on its relationship to a legitimate government purpose.

561 F.3d at 369.

We agree. As in *Brown*, the Pennsylvania legislature was free to consider the reliance interests of communities throughout the state as well as

34

those of the deceased funeral directors' family in crafting the limitations contained in the FDL. The means chosen is a rational (though perhaps imperfect) means of achieving those ends, and Section 8(a) of the FDL does not violate substantive due process.[18]

### 3. "Place-of-practice" and Full-Time Supervisor Requirement

As explained above, a license issued pursuant to the FDL only authorizes a licensee to practice at one primary location and one branch location; each location must have its own full-time and licensed supervisor. 63 Pa. Stat. Ann. §§ 479.7, 479.8(e). The District Court concluded that both provisions denied Plaintiffs' right to substantive due process because the Board's asserted interests in ensuring "competency, public health, accountability, and competition [were] not rationally related to the [FDL's] restrictions . . . ." *Heffner*, 866 F. Supp. 2d at 400.

On appeal, the Plaintiffs concede the State has a legitimate concern in safeguarding these interests, but they argue that the legislature could not have rationally believed that the place-of-practice restriction and full-time supervisor requirement would serve that purpose.[19] Once again, we disagree.

We haven repeatedly stressed the obvious; Pennsylvania clearly has a legitimate interest in protecting consumers who must venture into the potentially exploitative market for funeral services. *See Brown*, 561 F.3d at 368. As the Court explained in *Kleese v. Pa. State Bd. Of Funeral Dirs*, 738 A.2d 523, 526 (Pa. Cmwlth. 1999), "[g]enerally, the time in which the consumer seeks the services of a funeral establishment is a very emotional and vulnerable time as a loved one has most likely just passed away leaving the consumer vulnerable and more susceptible to being deceived or cheated." Limiting licensees to one primary location and one branch, each with its own licensed supervisor, clearly helps to protect against funeral directors being "spread too thin" to provide personal, caring, and sensitive services to those who are mourning the loss of a loved one. Funeral businesses clearly must operate with a sensitivity and personalized service unlike few other business we can think of, and Pennsylvania's legislature can hardly be faulted for imposing restrictions that are intended to address the unique concerns in that industry.

---

[18] For the same reasons, we also reject the Plaintiffs' claim that Section 8(e) of the FDL is unconstitutional. That provision provides that a licensed shareholder of an RBC may bequeath his or her shares or stock in the restricted corporation to immediate family members.

[19] The Plaintiffs correctly note that the Board has not articulated benefits or legitimate purposes that *specifically* underlie the place-of-practice restriction in its briefing to us. Plaintiffs' Br. at 35. However, the Board's brief does assert that the FDL's "operational provisions"—which it defines to include the FDL's place-of-practice restriction, full-time supervisor requirement, preparation room requirement, and restrictions on food service—are all in place to further "a variety of legitimate interests such as quality assurance, accountability, and health and safety." Appellant's Br. at 16. In any case, we note that, as the party challenging the Commonwealth's statute, the Plaintiffs bear the burden of refuting "'every *conceivable* basis which might support it,'" *Beach Commc'ns, Inc.*, 508 U.S. at 315 (emphasis added), not just those that the Commonwealth may assert, *see Connelly*, 706 F.3d at 216.

Likewise, the place-of-practice requirement is a rational means of advancing accountability by ensuring that a funeral director is more readily accessible to answer questions from grieving and particularly vulnerable consumers. The requirement of a full-time supervisor is so obviously reasonable as to negate the need for in-depth discussion or inquiry. We merely note that the Pennsylvania General Assembly could have rationally believed that requiring a licensed funeral director to oversee each funeral home advances the goal of maintaining professional standards at funeral establishments, and, by extension, safeguards public health, safety, and welfare. It also increases the likelihood that vulnerable consumers will be able to readily communicate with someone who is responsible for providing services for a deceased loved one. It is reasonable to assume that the individuals who have met the State's licensing requirements are much better equipped to supervise funeral home operations than an unlicensed entrepreneur would be. *Cf. Guardian Plans Inc.*, 870 F.2d at 126 (noting legislature "could have rationally determined that keeping the arrangement of funerals in the hands of licensed funeral professionals would benefit the public by ensuring competence in funeral arrangement").

We are similarly unpersuaded by the Plaintiffs' suggestion that a funeral home that routinely performs 1,000 funerals each year and another that performs only twenty-five would each comply with the requirement so long as they hired a *single* supervisor. That reality does not alter the result of our rational basis review. The State could have adopted a different scheme that would have required funeral homes that routinely perform a high volume of funerals each year to retain multiple supervisors. However, as we explained above, "[a] legislative policy decision about where [] line[s] should be drawn . . . '[is] not legally relevant under substantive due process jurisprudence.'" *Alexander*, 114 F.3d at 1406 (quoting *Sammon*, 66 F.3d at 647)).

## 4. The Preparation Room Requirement

The Plaintiffs also argue that requiring each funeral home to include a preparation room for on-site embalming is irrational because neither the FDL nor the Board's regulations require that a funeral establishment actually use this room.[20] According to Plaintiffs, the preparation room requirement is not practical and it hinders funeral directors' ability to prepare bodies in a more cost-effective centralized location. Plaintiffs explain that centralizing this service would achieve economies of scale that would benefit consumers and allow funeral directors to service other locations as part of a "cluster." Plaintiffs contend that requiring each funeral home to have its own preparation room (which may not even be used) thus imposes significant expense on consumers with little (if any) corresponding benefit. The District Court agreed that "there is no rational relationship between providing access to preparation rooms and requiring that funeral homes expend unnecessary funds on the same when the Board [has] recognize[d] that many existing preparation rooms remain []

---

[20] Pennsylvania law does not require that all deceased remains be embalmed. Instead, families can choose whether or not to embalm a deceased person. *See, e.g.*, 49 Pa. Code § 13.201(6)(i) ("Human remains held 24 hours beyond death shall be embalmed or sealed in a container that will not allow fumes or odors to escape or be kept under refrigeration, if this does not conflict with a religious belief or medical examination.").

unused, and . . . costs are merely passed on to consumers." *See Heffner*, 866 F. Supp. 2d at 402.

The Board once again asserts several purportedly legitimate interests that support this requirement. The Board claims that this requirement: (1) minimizes the time between death and embalming, leading to better results; (2) reassures families regarding the safeguarding of their loved ones; (3) minimizes the possibilities for accidents in transit and mix-ups at separate embalming facilities; and (4) ensures that the funeral director with whom the family communicates is directly accountable for the results of his/her work.

The record contains an uncontested expert report which shows that Pennsylvania's requirement of an on-site embalming preparation room at each funeral establishment is consistent with the regulatory scheme of at least eighteen other states – each of which had a similar requirement as of the latter-half of 2010.[21] *See J.A. 635; see also Powers v. Harris*, 379 F.3d 1208, 1212-13 (10th Cir. 2004) (noting Oklahoma had similar preparation room requirement as of date case decided). Although a majority of states have chosen not to adopt this approach and either allow funeral directors to "cluster" embalming operations under an economy of scale model or exempt certain funeral establishments from having a preparation room, the costs or benefits of these approaches are beyond the parameters of our due process inquiry. A chosen legislative scheme need not be the most efficient or even the most practical to be reasonable under the Due Process Clause. *See Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 487-88 (1955) ("[A] law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."). Moreover, the rationale advanced by the Board to support the preparation room requirement seems so patently reasonable as to eliminate the need for much discussion. *See Ferguson v. Skrupa*, 372 U.S. 726, 729 (1963). As long as the State has chosen a rational method of addressing its concerns, our inquiry is at an end. *See id.* ("[I]t is up to legislatures, not courts, to decide on the wisdom and utility of legislation.").

Indeed, even if we credit the Plaintiffs' assertion—and the Board's concession in the 2008 legislative materials that many preparation rooms built to comply with the FDL are never actually used for embalming—the result of our rational basis review would be the same. The Constitution does not protect against inefficient, wasteful, or meaningless legislation. "[A] law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the [] requirement." *Id.* at 487. Consequently, we hold that the District Court erred in concluding that the separate embalming room requirement violates the Plaintiffs' right to substantive due process.

## 5. Restriction on Serving Food

---

[21] According to the Board's submissions, the following states, in addition to Pennsylvania, all required funeral homes to each contain a preparation room as of late 2010: Alabama, Arizona, Connecticut, Delaware, Georgia, Idaho, Massachusetts, Mississippi, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, South Dakota, Tennessee, and Wyoming. J.A. 635.

In addition to the preparation room requirement, Section 7 of the FDL also prohibits funeral establishments from serving "food or intoxicating beverages." 63 Pa. Stat. Ann. § 479.7. The provision does allow funeral establishments to serve customers non-alcoholic beverages, but only in "a separate room not used for the preparation of funeral service." *Id.*

The District Court concluded that this restriction also violated substantive due process. *See Heffner*, 866 F. Supp. 2d at 403-04. The Court based its ruling, in part, on a proposed 2009 regulation in which the Board recommended repeal of these restrictions. The District Court explained its rejection of the Board's argument that the food prohibition furthered the government's legitimate interest in promoting public health as follows: "[the Board] fail[ed] to explain how the use of [] chemicals in one part [of the facility] . . . would necessarily contaminate other areas of the establishment providing food service . . ." *Id.* at 404. The Court relied on the fact that bodies are prepared in one area of a funeral establishment and food is served elsewhere. Ultimately, the District Court concluded that the restriction did not survive rational basis review because: (1) the fact that non-alcoholic *beverages* could be served but food could not presented a "distinction without a difference," *id.*, and (2) it was irrational for the FDL to allow food to be served in certain areas within the same structure so long as those areas were not designated as parts of a "funeral establishment," *id.*

On appeal, the Board reiterates its position that "public health" is a legitimate government interest justifying the FDL's ban on food service at funeral establishments. The Board argues that the legislature could have reasonably concluded that food should not be served where the embalming of human bodies is occurring. The Board also argues that the ban on serving food furthers the government's interest in upholding the unique nature and solemnity of funeral services.

Whether one agrees with the Board's position, and assuming *arguendo* that the Board's reasoning is erroneous, it is exceedingly difficult to understand how it could be viewed as unreasonable. The first prong of the rational basis test is easily satisfied by the Board's asserted interest in public health.[22] *See Watson v. Maryland*, 218 U.S. 173, 176 (1910) ("It is too well settled to require discussion . . . that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health."). We fail to see anything irrational in the legislative decision to prohibit the service of food and alcoholic beverages in areas designated as "funeral establishments" under the FDL.[23] It may well be that the legislature's concern

---

[22] Because we believe that the Commonwealth's asserted interest in protecting public health is legitimate, we do not pass judgment on whether the Board's second asserted interest—*i.e.*, "preserving the unique nature and solemnity of the funeral service"—also qualifies as a legitimate government interest under substantive due process review. *See N.J. Retail Merchs. Ass'n*, 669 F.3d at 398 (noting statute "will pass rational basis examination" where one of several stated purposes was not legitimate "as long as it was not the only legitimate purpose underlying the legislation").

[23] Indeed, the authority of states to regulate and tightly restrict the availability of alcohol is far too evident to require either citation or discussion, and Pennsylvania's restrictions on the availability of alcohol are particularly strict. *See generally* 47 Pa. Stat. §§ 4-491– 494. However, such tight controls (of

38

had more force in an earlier time when refrigeration and sanitation were not as developed as they are today, outdoor temperatures could more readily affect sanitation as well as food storage and preservation, and attitudes about serving and consuming alcohol were nowhere near as liberal. Thus, the passage of time, and the advanced technology used in modern air conditioning and ventilation systems suggest that the Pennsylvania General Assembly may want to revisit the need for some of these restrictions as the Board has suggested.

However, there is a fundamental difference between legislative enactments that may be archaic and those that are irrational for purposes of our substantive due process inquiry. These restrictions may now be overly cautious, but excess caution does not rise to the level of a due process deprivation if it is reasonably intended to advance a legitimate governmental interest. It is not up to a court to determine if the State has struck the *perfect* balance of advantage and disadvantage in addressing its interest, nor should we compel legislatures to reexamine restrictions that may seem better suited for an earlier time. *See Heller v. Doe*, 509 U.S. 312, 321 (1993) ("[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends."). The Constitution is not a lever that we can use to overcome legislative inertia. This restriction, though perhaps antiquated, is nevertheless sufficiently reasonable to survive rational basis review.

## 6. Trust Requirement

Funeral directors in Pennsylvania routinely sell and provide "pre-need" funeral services – *i.e.*, services selected in advance of a person's death. *See generally Walker v. Flitton*, 364 F. Supp. 2d 503 (M.D. Pa. 2005). Because these contracts require advance payment for goods and services associated with funeral homes, Pennsylvania (like many other states) imposes trust requirements on pre-need sellers.[24] Specifically, the FDL requires that a funeral director who enters into a pre-need contract deposit 100% of the proceeds accepted for "funeral services," such as embalming, into an escrow account or trust. 63 Pa. Stat. Ann. § 479.13(c).[25]

---

which the FDL is but one example) do not rise to the level of a due process violation.

[24] *See generally* Judith A. Frank, *Preneed Funeral Plans: The Case for Uniformity*, 4 Elder L.J.1, 7-8 (1996) (discussing trust arrangement as "most common form of funding" in preneed funeral contract context and collecting States' statutes establishing trust requirement).

[25] In relevant part, the FDL states:

> No person other than a licensed funeral director shall, directly or indirectly, or through an agent, offer to or enter into a contract with a living person to render funeral services to such person when needed. If any such licensed funeral director shall accept any money for such contracts, he shall . . . either deposit the same in an escrow account in, or transfer the same in trust to, a banking institution in [Pennsylvania], conditioned upon its withdrawal or disbursement only for the

This trust arrangement is confusing because another statute, the Pennsylvania Future Interment Act ("FIA"), only requires that 70% of the sales price of funeral-related property—*e.g.*, caskets, vaults, or urns— be held in trust. *Id.* § 480.1. This creates an obvious problem for funeral directors who provide pre-need services. In an attempt to reconcile the tension in these statutes, the Board took the position that funeral directors were only required to hold in trust 70% of the sales price customers paid for pre-need funeral *merchandise*, but that they had to hold 100% of pre-need monies for other "funeral services" in trust.

In *Pennsylvania Funeral Directors Ass'n v. Bd. of Funeral Directors*, 494 A.2d 67 (Pa. Cmwlth. 1985), *aff'd mem.*, 511 A.2d 763 (Pa. 1986) ("*PFDA*"), the Commonwealth Court of Pennsylvania disagreed with the Board's position and held that the FIA "did not abrogate the one hundred per cent trust requirement in . . . the [FDL]." *Id.* at 72. The Board thereafter adopted the view that a merchandising company that is not itself a licensee but is nevertheless owned in part by a licensed funeral director may trust at the FIA-prescribed rate of 70%, so long as the company is not used to evade the FDL's requirements.

In challenging the trusting provisions, Plaintiffs argue that requiring licensed funeral directors to hold in trust 100% of pre-need monies received does not further the State's asserted interest in consumer protection, and the District Court agreed. *See Heffner*, 866 F. Supp. 2d at 423. However, the fact that Pennsylvania's statutory scheme restricts individuals whom the State has certified as experts, while exempting unlicensed merchants, does not necessarily result in an irrational (and therefore unconstitutional) scheme. As the Commonwealth Court explained in *PFDA*, Pennsylvania's legislature could have reasonably "believed that the public's perception of funeral directors as licensed professionals necessitated stricter standards to protect consumers." 494 A.2d at 71.

In addition, the Board correctly notes that the trust requirements also pass constitutional muster under the separate interpretation that it has adopted and endorsed. *See Skilling v. United States*, 130. S. Ct. 2896, 2929 (2010) ("'[E]*very reasonable construction* must be resorted to, in

purposes for which such money was accepted.
63 Pa. Stat. Ann. § 479.13(c).

40

order to save a statute from unconstitutionality.'" (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895))). As we have just explained, after *PFDA* was decided, the Board adopted the view that funeral directors with an ownership interest in a merchandising company may sell pre-need funeral property if their company is owned and operated "separate and apart" from a funeral home or establishment. Plaintiffs concede that the Board explained its position in a 1991 memorandum, which outlined a series of factors that could be used to determine whether a merchandising company's operations are sufficiently separate from those of a funeral establishment. J.A. 1144-45.[26]

Moreover, the potential for consumer abuse and fraud in any scheme that allows merchants to accept payment for goods and services that will not be tendered until some future date is painfully obvious. This is especially true where, as here, the date for the vendor's performance may well be decades after accepting payment. Requiring proceeds accepted under such an arrangement to be placed in trust is not only logical, but imperative if vulnerable consumers are to be protected from the unscrupulous (or financially "strapped") vendor. *Cf. Nat'l Funeral Servs., Inc. v. Rockefeller*, 870 F.2d 136, 143 n.11 (4th Cir. 1989) (relying upon attorney solicitation Supreme Court cases to uphold West Virginia's ban on door-to-door and telephone solicitation for funeral pre-need contracts and noting that, "[i]n both [contexts], an advocate trained in the art of persuasion is trying to convince an emotionally vulnerable layperson that he needs professional services"). The requirements of the FDL and FIA are reasonable standing alone. The Board's attempt to resolve the tension between

---

[26] Among the factors outlined in a memo authored by then-Board prosecutor Kathleen Grossman are:

> [A]re the pre-need sales merchandising corporations . . . operated separate and apart from the funeral business . . . .? Are there two sets of bookkeeping records kept? Separate advertising signs? Do the corporations display signs for public view at all? Which businesses display signs? Are there separate entrances? How is the building set up, i.e., a common vestibule leading to separate suites?

J.A. 1145.

41

those two statutes may be awkward or even strained, but it is not unreasonable and it is consistent with Pennsylvania's legitimate public interest.[27] Accordingly, we part with the District Court's conclusion that the trust requirement results in a constitutional deprivation.

## F. First Amendment

The Plaintiffs claim that the FDL's restrictions on commercial speech violate the First Amendment. It is long-settled that the First Amendment protects commercial speech. *See Va. Bd. of Pharma. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976). Several arguments are subsumed in the Plaintiffs' First Amendment challenge, and we will discuss the merits of each of these claims in turn.

## 1. Restriction on Use of Trade Names

Subject to limited exceptions,[28] Section 8 of the FDL requires that funeral homes operate under the name of the current funeral director or that of a predecessor. *See* 63 Pa. Stat. Ann. §§ 479.8(a), (b), (d), 479.9(a).[29] For example, if a hypothetical funeral director named "Jane Smith" purchased the "Johnson Funeral Home," she would only be able to continue to operate the establishment under its current name or as the "Smith Funeral Home." The Plaintiffs claim that this restriction on the use of trade names violates the First Amendment.

### a. Applicability of Central Hudson & Gas Electric Corp.'s Test

At the outset, the parties dispute whether we should assess the merits of the First Amendment claim under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980), or whether *Friedman v. Rogers*, 440 U.S. 1 (1979), controls.

In *Friedman*, the earlier of these two cases, the Supreme Court upheld a Texas law that proscribed the practice of optometry under a trade name. *See Friedman*, 440 U.S. at 3-4. The Court distinguished the use of trade names from other types of "commercial speech" such as product or service advertisements

---

[27] Indeed, although we do not hold that resolution of the tension between the 100% requirement in the FDL and the 70% requirement in the FIA necessitates it, the Commonwealth could rationally have argued that the dangers inherent in the deferral of performance that is endemic in pre-need contracts requires that 100% of the contract price be placed in trust to ensure performance under the contract.

[28] Section 9 of the FDL excepts funeral homes owned by "grandfathered" pre-1935 corporations from this requirement. 63 Pa. Stat. Ann. § 479.9(a).

[29] Even in that circumstance, funeral homes owned by a sole proprietor or partnership that operate under the name of a predecessor funeral director must disclose the name of the current owner in advertising. *Id.* § 479.8(a). Funeral homes owned by an RBC or professional (pre-1935) corporation that operate under a predecessor's name must similarly disclose the name of the home's licensed supervisor. *Id.* §§ 479.8(b), (d).

by explaining that while the latter are "self-contained and explanatory," a trade name will generally have "no intrinsic meaning." *Id.* at 12. The Court then stated that because "ill-defined associations of trade names with price and quality information can be manipulated by the users of trade names, there is a significant possibility that trade names will be used to mislead the public." *Id.* at 12-13. Given the State's "substantial" interest in "protecting the public from the deceptive and misleading use of [] trade names" and the Court's conclusion that the restriction only had "incidental effect on the content of the commercial speech involved," the Supreme Court rejected the plaintiffs' challenge. *Id.* at 15-16. Not surprisingly, Pennsylvania urges us to apply *Friedman* because it is more favorable to the State's position than *Central Hudson.*

However, *Friedman*'s applicability and continued viability is not as clear as the Commonwealth would have us believe because the Court subsequently adopted a more detailed test for limitations on commercial speech in *Central Hudson.* There, the Court explained that a court considering the validity of a restriction on commercial speech must first ask whether the commercial speech concerns unlawful activity or is misleading. 447 U.S. at 566. If the speech is neither, the reviewing court must then determine "whether the asserted governmental interest is substantial." *Id.* If it is, the third and fourth prongs of the *Central Hudson* inquiry require a court to respectively inquire "whether the regulation directly advances the governmental interest asserted" and whether the regulation is "more extensive than is necessary to serve that interest." *Id.*

In subsequent cases, the Supreme Court has provided additional guidance by explaining that—in the professional services context—commercial speech that is *actually* misleading "may be prohibited entirely," *In re R.M.J.*, 455 U.S. 191, 203 (1982), while *potentially* misleading speech may be regulated but not entirely curtailed, *id.*

Although Pennsylvania does not urge us to wholly disregard the *Central Hudson* test, it does suggest that *Friedman* is sufficiently on point to resolve our inquiry in the Commonwealth's favor and that we should avoid parsing through the four prongs of *Central Hudson.* The State's argument goes too far.

As noted, *Friedman* predated the four-part *Central Hudson* test and the latter distinction between commercial speech that is "actually misleading" and that which is "potentially misleading." *See Wine & Spirits Retailers v. Rhode Island*, 481 F.3d 1, 8 (1st Cir. 2007) ("Since its decision in *Friedman*, the Court has made a doctrinal refinement, distinguishing in the professional services context between commercial speech that is inherently or actually misleading and commercial speech that is only potentially misleading."). Accordingly, even where *Friedman* applies, federal courts commonly conduct an analysis within the framework of the more "refined" and nuanced test set forth in *Central Hudson. See Alexander v. Cahill*, 598 F.3d 79, 95-96 (2d Cir. 2010) (considering *Friedman*'s applicability to challenge against certain New York restrictions on attorney advertising as part of *Central Hudson* test); *Wine & Spirits Retailers*, 481 F.3d at 8-9 (same).[30] Our inquiry will be thus be guided by the more recent decision in *Central Hudson.*

---

[30] Thus, the *Central Hudson* test would not apply if the Commonwealth could show that the use of trade names in the funeral industry is either unlawful or inherently misleading. *See Wine & Spirits Retailers*, 481 F.3d at 8 ("It is not always necessary . . . to deal with each of the test's four parts. In framing the

43

## b.  *The Central Hudson Test*

As noted, *Central Hudson*'s threshold requirement is that the regulated speech concern lawful activity and not be misleading.  Here, there is neither evidence nor allegation that the use of trade names in the funeral industry would either mask or facilitate illegal activity.  Instead, Pennsylvania heavily relies on *Friedman* to suggest that the use of trade names presents "numerous" opportunities for deception of the public—*e.g.*, by keeping a trade name despite staff changes and freeing proprietors from relying on their personal reputation to attract business.

We agree that *Friedman* underscored "the significant possibility that trade names will be used to mislead the public" in the context of invalidating Texas's ban on trade names in the field of optometry.  *Friedman*, 440 U.S. at 12.  However, the Board's argument ignores the record that the Court's analysis was based on in *Friedman*.  *See Friedman*, 440 U.S. at 13 ("The concerns of the Texas Legislature about the deceptive and misleading uses of optometrical trade names were not speculative or hypothetical, but were based on experience in Texas with which the legislature was familiar . . . .").  Indeed, as other courts have noted when considering challenges to an across-the-board ban on the use of trade names, in *Friedman* Texas "marshaled substantially strong[] and [] specific evidence supporting its prohibition on trade names" in the field of optometry.  *Alexander*, 598 F.3d at 96.  There has been no such showing here.

Moreover, while *Friedman* provides *some* support for the Commonwealth's position, the lack of record support for its parade of hypothetical horribles suggests caution before concluding that trade names in the funeral industry are sufficiently misleading to rest our analysis upon *Friedman*.  Instead, we conclude that the assignment of trade names to funeral homes is, at best, potentially misleading, and we must therefore consider the remaining prongs of the *Central Hudson* test.

Obviously the Board's asserted government interest in providing accurate information to the public is "substantial."  *See Friedman*, 440 U.S. at 15-16 (noting State's interest in protecting public from deceptive and misleading use of trade names in optometry industry is "substantial and well demonstrated").  However, the FDL's ban on the use of trade names in the funeral industry cannot survive the limitations imposed under *Central Hudson*.  Under its requirements, "the government must demonstrate that the challenged law 'alleviates' the cited harms 'to a material degree.'"  *Pitt News v. Pappert*, 379 F.3d 96, 107 (3d Cir. 2004) (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995) (alterations omitted)).

That requirement is inconsistent with a statutory scheme that is fatally "underinclusive."  *See City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) ("Exemptions from an otherwise legitimate regulation . . . . [m]ay diminish the credibility of the government's rationale for restricting speech in the first place."); *see also Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 905 (9th Cir. 2009) ("To put it in the context of the *Central Hudson* test, a regulation

---

inquiry, the threshold question is whether 'the commercial speech concerns unlawful activity or is misleading.'  If so, the inquiry ends there: 'the speech is not protected by the First Amendment.'" (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002))).  The Board has not made such a showing.

may have exceptions that 'undermine and counteract' the interest the government claims it adopted the law to further; such a regulation cannot 'directly and materially advance its aim.'" (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995))).

The restrictions on commercial speech here are so flawed that they cannot withstand First Amendment scrutiny. Indeed, the District Court correctly identified the pivotal problem concerning the FDL's proscription at *Central Hudson*'s third step: by allowing funeral homes to operate under predecessors' names, the State remains exposed to many of the same threats that it purports to remedy through its ban on the use of trade names. *See Heffner*, 866 F. Supp. 2d at 408. A funeral director operating a home that has been established in the community, and known under his or her predecessor's name, does not rely on his or her own personal reputation to attract business; rather, the predecessor's name and reputation is determinative. Nor does a funeral home operating under a former owner's name provide transparency or insight into changes in staffing that the Board insists is the legitimate interest that the State's regulation seeks to further.

Moreover, unlike in *Friedman,* there is nothing in the record here to even suggest that the use of trade names in the funeral industry has either mislead or deceived the public to a greater degree than using a predecessor's name, and the Board does not suggest otherwise. Thus, we agree with the District Court that the FDL's trade name ban is irrevocably "pierced" by the type of "exemptions and inconsistencies" that the Supreme Court has in found fatal to First Amendment scrutiny.[31] *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488 (1995); *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424-26 (1993); *Fla. Star v. B.J.F.*, 491 U.S. 524, 540 (1989).

## 2. Payment on Commissions to Unlicensed Salespeople

The second issue that the Plaintiffs attack on First Amendment grounds concerns the constitutionality of Section 11(a)(8) of the FDL. In relevant part, that section provides that a funeral director or funeral home's license may be suspended if a licensee pays unlicensed employees commissions on sales for pre-need funeral arrangements. *See* 63 Pa. Stat. Ann. § 479.11(a)(8). The Board has implemented this restriction by promulgating regulations prohibiting payment of "any gratuity" or "valuable consideration" to unlicensed employees. In Count XIII of the Plaintiffs' amended complaint, they argue that this restriction is unconstitutional because it prohibits anyone but a licensed funeral director from communicating with customers about services or merchandise. *See Walker v. Flitton*, 364 F. Supp. 2d 503, 503, 507 (M.D. Pa. 2005) (holding that the First Amendment precludes a prohibition on unlicensed employees and

---

[31] Because we conclude that the FDL's proscription on the use of trade names does not pass *Central Hudson*'s third step, we need not discuss the fourth "narrow-tailoring" prong. We note, however, that the Supreme Court has recognized that the third and fourth prongs of the test complement each other and has observed that the four factors of the analysis are "not entirely discrete." *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001); *Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 183, 188; *see also Metro Lights, L.L.C.*, 551 F.3d at 904 (noting "[i]t has not always been clear how [inquiry into a regulation's 'fit'] differs with respect to the last two steps of the *Central Hudson* analysis").

agents from interacting with customers).  The Plaintiffs allege that this restriction on commissions similarly violates the First Amendment under the reasoning in *Central Hudson*.  We disagree.

Here again, the Commonwealth's articulated interest in consumer protection is undoubtedly substantial.  "The whole premise behind earning a commission is that the amount of sales [] increase[s] the rate of pay." *Parker v. NutriSys., Inc.*, 620 F.3d 274, 284 (3d Cir. 2010) (internal quotation marks and citation omitted).  It is therefore eminently reasonable for a legislature to want to protect consumers from dealing directly with salespeople who have a financial interest in "upselling" more expensive or unnecessary merchandise and services than are appropriate for a given consumer's situation or resources. *See Walker*, 364 F. Supp. 2d at 520 (recognizing "substantial governmental interest in protecting the general public as it relates to the dissemination of information regarding, and the purchasing of, preneed funerals.").

The potential for this evil to manifest itself in the context of sales personnel being rewarded for exploiting the need to afford a loved one a "proper" or "respectful" burial or memorial is too obvious to require elaboration.  Customers looking to purchase funeral arrangements and services are clearly among the most vulnerable consumers to be found in any marketplace.

We therefore have little difficulty in concluding that this restriction easily satisfies the third *Central Hudson* prong.  Section 11(a)(8) "directly and materially" advances the State's asserted interest by removing the financial incentive that salespersons would have to oversell pre-need funeral services.

We realize that the consumer protection afforded by this statutory scheme is imperfect.  For example, it still allows salaries or bonuses to be influenced by the volume or amount of sales, and this may still incentivize the unscrupulous sales person to prey upon the unwary and vulnerable consumer.  However, this flaw does not suggest that the protection is so under-inclusive that it imposes an unconstitutional restriction on commercial speech.  Salespersons in the funeral industry are obviously as entitled to compensation as any other sales persons, and any compensatory scheme may favor those who sell more goods and/or services than their colleagues.  Perhaps because such realistic considerations limit the potential effectiveness of any such scheme, the Supreme Court has explained that "[its] commercial speech cases establish that localities may stop short of fully accomplishing their objectives without running afoul of the First Amendment."). *Discovery Network, Inc.*, 507 U.S. at 442; *see also Metromedia, Inc. v. San Diego*, 453 U.S. 490, 511 (1981) (upholding San Diego's proscription on offsite billboard advertising and rejecting plaintiffs' argument that ban was underinclusive because it did not also cover onsite advertising).  We therefore believe that the FDL's ban on payment of commissions to unlicensed sales people is a constitutional remedy that is sufficiently tailored to satisfy *Central Hudson*.[32]

---

[32] The only alternative that would eliminate any room for upselling would be mandating a flat compensation for all employees.  Assuming such a scheme would be legal, it would prevent businesses from rewarding those employees who show extraordinary dedication to their jobs by doing the "little things" that employers rarely require but nevertheless expect from employees.

## G. Contract Clause

Finally, the Plaintiffs contend that the Board's interpretation of the FDL's trust provisions violates the Constitution's Contract Clause by impairing pre-need contracts between the Plaintiffs and their customers.

The Contract Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art I, § 10, cl. 1. To show a Contract Clause violation, a plaintiff must demonstrate that a change in state law effectively altered a contractual obligation. *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). Our Contract Clause inquiry must consider "[(1)] whether there is a contractual relationship, [(2)] whether a change in law impairs that contractual relationship, and [(3)] whether the impairment is substantial." *Id.* If all three questions are answered affirmatively, we must then "inquire whether the law at issue has a legitimate and important public purpose and whether the adjustment of the rights to the contractual relationship was reasonable and appropriate in light of that purpose." *Transp. Workers Union Local 290 v. SEPTA*, 145 F.3d 619, 621 (3d Cir. 1998).

The premise for the Plaintiffs' Contract Clause argument is that the post-*PFDA* regime, whereby funeral directors who receive money in the sale of pre-need merchandise may trust funds at the FIA rate of 70% if their operations are separate from those of a funeral establishment, is not the actual state of the law. According to the Plaintiffs, the Board has recently reversed its stated position and currently requires 100% of all pre-need sales of merchandise to be held in trust if the corporation selling the goods is owned in whole or in part by a licensed funeral director. The Plaintiffs largely base their claim on a regulation that the Board proposed in August 2007 but later withdrew and never enacted. *See* 37 Pa. Bull. 4643, 4646 (Aug. 25, 2007) ("A preneed funeral contract may not incorporate a contract for funeral merchandise entered into by a person or entity other than a funeral director.").

The Plaintiffs argue that the Board's proposed interpretation requiring 100% trust of all funds paid as compensation for pre-need funeral services be put in trust impaired the Plaintiffs' contractual obligations with existing consumers. The Board initially allowed licensed funeral directors to own corporations that sold pre-need merchandise as long as those corporations were wholly separate from funeral homes. The Plaintiffs claim that they relied on that interpretation only to have their expectations frustrated when the Board proposed a regulation banning this practice in August 2007.

The Plaintiffs' Contract Clause arguments fail as a matter of law for two obvious reasons. First, the Plaintiffs have not even shown that there was a change in state *law*. Just as we discussed earlier, the Plaintiffs' articulation of the current state of the law in Pennsylvania is based on a proposed regulation

47

that the Board never formally prescribed.  *See* 37 Pa. Bull. 4643, 4646 (Aug. 25, 2007).  Indeed, the record shows—and the Plaintiffs concede—that the Board withdrew this proposal in December 2009, and it never took effect.  Thus, the Plaintiffs have not shown even a threshold action that could be characterized as a burden on their contractual obligations with consumers.

Second, even if the Plaintiffs could show that the Board's proposed regulation had the force of law, the Board's reinterpretation of the FDL would not implicate the Contract Clause.  "The Supreme Court has made clear that the language of the Contract Clause (*i.e.*, "pass any . . . law") means that the clause applies only to exercises of legislative power."  *Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 874 (3d Cir. 2012).  While the Clause's application is by no means limited to the formal enactments of a State's legislature,[33] "[t]he Supreme Court has rejected the argument that the Contract Clause is violated when there is a new interpretation of an antecedent state statute."  *Id.* at 875.

Here, the Plaintiffs accuse the Board of reversing its own interpretation and application of longstanding FDL provisions.  Such a reversal is simply not the kind of "exercise of legislative authority" that the Contract Clause proscribes.  *See id.* (holding Pennsylvania Department of Transportation's interpretation and application of law that had been in force for over 30 years "did not exercise legislative authority subject to scrutiny under the Contract Clause").

## III.    Conclusion

For the foregoing reasons, we reverse the District Court's judgment striking down the FDL's warrantless inspection scheme on Fourth Amendment grounds.  We also reverse the District Court's judgments concerning the Plaintiffs' dormant Commerce Clause challenges to certain provisions of the FDL.  We reverse as well the District Court's conclusions that the disputed FDL provisions violate the substantive component of the Due Process Clause.  We also reverse the District Court's ruling that the Board's actions unconstitutionally impair the Plaintiffs' private contractual relations with third parties in violation of the Constitution's Contract Clause.  We will affirm the District Court's ruling that Pennsylvania's ban on the use of trade names in the funeral industry runs afoul of First Amendment protections, but reverse its ruling that the ban on the payment of commissions to unlicensed salespeople violates the Constitution.  Finally, we remand to the District Court to modify its order in accordance with this opinion.

---

[33] We recently explained that "[t]here is no simple formula for determining whether a government act is an exercise of legislative authority."  *Mabey Bridge & Shore, Inc.*, 666 F.3d at 874.  However, Supreme Court cases offer some guidance.  A government act will "bear[] the hallmarks of legislative authority when it 'changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power.'"  *Id.* (quoting *Ross v. State of Oregon*, 227 U.S. 150, 163 (1913)).  Conversely, "an act is likely *not* legislative when 'its purpose was not to prescribe a new law for the future, but only to apply to a completed transaction laws which were in force at the time.'"  *Id.* (quoting *Ross*, 227 U.S. at 163).